Robert MATA, Petitioner-Appellant,

v.

George W. SUMNER, Warden of the
California State Prison at San
Quentin, Respondent-Appellee.

No. 78–2636.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 15, 1979.

Decided Jan. 20, 1983.

Jamie Jacobs-May, Deputy Atty. Gen., San Francisco, Cal., for respondent-appellee.

Before ELY and SNEED, Circuit Judges, and TAKASUGI,* District Judge.

ELY, Circuit Judge:

Robert Mata appeals from the District Court's denial of his Petition for Writ of Habeas Corpus. The Petition followed Mata's murder conviction in California state court and his exhaustion of all available state court remedies. We reverse.

## I.

In this opinion we endeavor for the third time to set forth the factual and legal bases for our firm conclusion that impermissibly suggestive pretrial photographic identification procedures violated Mata's constitutional right to due process of law. The United States Supreme Court vacated and remanded our initial disposition, *Mata v. Sumner*, 611 F.2d 754 (9th Cir.1979), citing our failure to apply the presumption of correctness mandated by 28 U.S.C. § 2254(d) to the factual determinations made by the California Court of Appeal in this case. *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). On remand we considered the state court's factual determinations in the context of 28 U.S.C. § 2254(d) and concluded that, because we "substantially agree[d]" with the historical or basic facts adduced by the California court, the requirement of explaining by reasoned written references the justification for dispensing with the presumption was inapplicable. *Mata v. Sumner*, 649 F.2d 713, 715–16, 717 (9th Cir. 1981). *See Sumner v. Mata*, 449 U.S. at

549, 101 S.Ct. at 770. The Supreme Court again vacated and remanded, citing our failure to heed the Court's earlier conclusion that certain of our factual findings were "considerably at odds" with the findings made by the state appellate court. *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 1305, 1307, 71 L.Ed.2d 480 (1982) (per curiam).

Having received additional briefing by the parties, we now attempt to review carefully the facts of this case, as reflected in the trial transcript and the findings of the California Court of Appeal, in compliance with 28 U.S.C. § 2254(d) and the most recent mandate of the Supreme Court. In doing so we emphasize that the Court has not reached the merits of our prior conclusion that the pretrial photographic identification procedures were so impermissibly suggestive in this case as to give rise to a very substantial likelihood of irreparable misidentification. *See* 102 S.Ct. at 1307; 449 U.S. at 552, 101 S.Ct. at 771. Our reevaluation of the facts only strengthens our conviction that the state has denied Mata that fairness required by the Due Process Clause of the Fourteenth Amendment. *See Manson v. Brathwaite*, 432 U.S. 98, 113, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977).

## II.

On October 19, 1972, inmate Leonard Arias was stabbed to death in a dormitory at the California Correctional Institution at Tehachapi, California. *People v. Vargas*, 5 Crim. 1735, slip op. at 2 (Cal.Ct.App. Aug. 4, 1975) (unpublished opinion by the Fifth Appellate District on Mata's direct appeal after trial) [hereinafter cited as Fifth District Opinion]; *see* Reporter's Transcript of Trial ("R.T.") at 365–96, 582–630 (eyewitness description of the incident). Three inmates were charged with the murder: Mata, David Gallegos, and Salvador Vargas. Each denied partaking in the attack and

---

* The Honorable Robert M. Takasugi, United States District Judge, Central District of California, sitting by designation.

each produced evidence tending to show that he was at another place in the prison at the time of the attack. Fifth District Opinion at 2. The prosecution elicited testimony that the murder was the result of feuding between opposing prison factions— the "Mexican Mafia" and the "Nuestra Family." *See* R.T. at 805–51 (testimony of member of Mexican Mafia). The victim, Arias, was reputed to be a member of the Nuestra Family who had allegedly previously attacked a member of the Mexican Mafia during his term at San Quentin, another California prison facility. *See id.* Arias had arrived at Tehachapi the day before he was killed. Fifth District Opinion at 2.

## A.

At about 1:30 p.m. on October 19, Arias and fellow inmates Rigoberto Almengor and Jay Allen were drinking coffee and talking near Allen's bunk in Dormitory Eight. Fifth District Opinion at 2; R.T. at 365–69, 582–84. A call over the institution's loud speaker ordered all new arrivals to report to the laundry room and, since Arias was a new arrival, Allen and Arias proceeded to the laundry room. Fifth District Opinion at 2; R.T. at 372–73, 584–85. Almengor, after starting to walk to the television room, decided to join Arias and Allen after Allen asked him to come along. R.T. at 372–73, 585.

On the way to the laundry room they passed three men who were standing by the bulletin board. These three then turned and attacked Arias. During the attack Arias was stabbed with a knife several times, causing his death. Fifth District Opinion at 2. Almengor testified that he was walking about even with Arias when the three men at the bulletin board area "turned around real fast" and began attacking Arias. R.T. at 373–74, 376. Almengor thought he should help Arias and approached the assailants. R.T. at 379, 393. The man Almengor later identified as Mata "slooped" away from attacking Arias and came at him with a knife. R.T. at 392, 747. Almengor and this man struggled for a few

seconds, R.T. at 960, 747, 381. Almengor threw a kick at him, R.T. at 747, 380, then they both backed off each other. R.T. at 381, 747. The two then stood looking directly at each other, eye-to-eye, about six feet apart, for "several seconds, several minutes." R.T. at 381–82, 742, 747–49, 960. Almengor, who is nearsighted, was not wearing his glasses at the time, R.T. at 449–50, but he testified that he didn't need them for the distance involved in the attack, R.T. at 489–91.

Allen testified that he didn't see who was fighting with Almengor. R.T. at 589, 796–97. Allen stood in front of and was preoccupied by another of the attackers, later identified as Vargas, who carried a large knife. At one point, this assailant lunged at Allen. R.T. at 614–16, 796. Allen backed up and then turned away from the fight, yelling for help. R.T. at 628–29. "It happened fast," Allen testified. R.T. at 642. When he turned back around the three assailants had turned and were fleeing; he grabbed hold of the fatally wounded Arias and lay him down. R.T. at 629–30, 619–20. Allen later told an investigator for the defendants that he never got a good enough look at any of the assailants to identify them. R.T. at 1110.

## B.

Prison investigators interviewed Allen and Almengor on several occasions after the stabbing, each time employing photographic arrays in an attempt to obtain an identification of the attackers:

*October 19*

Correctional Lieutenant Robert King and Investigator Maurice Higgins interviewed Almengor at about 5:00 p.m. on the day of the incident. Fifth District Opinion at 3; R.T. at 707–10. Almengor asked to see photographs of all the Mexican-American inmates in the facility; Lieutenant King showed him between two and five hundred mug shots of prison inmates. R.T. at 397, 285–86, 422, 739. Almengor made a "positive" identification of inmate Pete Nunez as one of the attackers. R.T. at 711. The record is conflicting as to whether Almen-

gor named Nunez before or after he was shown Nunez' photograph. *See* R.T. at 398–400, 420, 707–19, 730–38. Lieutenant King told Almengor that Nunez could not have been involved in the incident because Nunez was not in the prison at the time of the stabbing. R.T. at 713. Almengor made a "possible," "tentative," but "never positive" identification of three to seven other inmates pictured in the mug shots. R.T. at 401–02, 432, 437–38, 712, 730–38. One of these was Vargas; also included were inmates Pete Ramirez and Jay Reymundo. Fifth District Opinion at 3; R.T. at 734. Almengor did not identify Mata as a participant. *Id.* Although Almengor requested to see the inmates in a line-up, a line-up was never held. R.T. at 781.

Lieutenant King and Officer Higgins also interviewed Allen on this date, but they did not show him any photographs. R.T. at 719–20. Allen said he could make no identification of the participants in the attack. R.T. at 720.

*October 27*

Almengor was shown a group of 24 photographs of inmates, including photographs of the three defendants. R.T. at 714–15. The defendants' photographs had been taken three to eight months earlier. R.T. at 917–18. Many of the other photographs in the array were considerably older—some as many as three, four, and even eight years old. R.T. at 918. Outside of Allen's presence, Almengor "possibly" identified Vargas, but it wasn't a "positive" identification. R.T. at 715. Again he failed to identify Mata. R.T. at 916. Almengor complained that the photographs were too old and requested up-to-date photographs. R.T. at 716, 916. Also, he repeated his request to see the inmates in a line-up. R.T. at 425, 496–97, 783, 932, 959.

Allen was shown the same group of photographs, but he did not identify anyone. Fifth District Opinion at 3; R.T. at 720–21. Like Almengor, he said the photographs appeared old. R.T. at 721.

*October 27—October 30*

Prison authorities shot new photographs of a number of inmates, including the de-

fendants, but they were not useable because of photographer error. R.T. at 716. The photographs of the three defendants were the only ones taken a second time. R.T. at 754. Allen and Almengor, who were housed in segregation together with the defendants and other inmates, saw the three defendants being taken to have their photographs retaken. R.T. at 444–46, 634, 1118–19. Almengor testified that he could not tell who the three men were but that he knew they were being taken to have their pictures retaken. R.T. at 444–46. However, Almengor said he knew that one of the three was defendant Gallegos. R.T. at 452. Allen told an investigator for the defendants that he recognized the three defendants as they were taken out and that, since they were the only ones in segregation to appear in the photographic array on October 30, he assumed "they must be the ones that did it." R.T. at 1118–19. At trial, however, he testified that he did not remember making such a statement. R.T. at 634. Moreover, while in segregation, both Allen and Almengor had spoken with Gallegos. R.T. at 443, 633.

*October 30*

Lieutenant King showed Almengor a group of 15 inmates' photographs, including the new photographs of the three defendants. Fifth District Opinion at 3; R.T. at 716. The defendants' photographs were dated October 27, 1972; the others were older—some as many as two years old. R.T. at 755–56. Not included in this group were the photographs of Ramirez, Reymundo, and Nunez. R.T. at 717–18. Almengor identified, without qualification, the photographs of Mata, Gallegos, and Vargas as being photographs of the assailants. Fifth District Opinion at 3; R.T. at 718, 741. Allen was then brought into Lieutenant King's office and, with Almengor at the other side of the room, Allen also identified the three defendants as the assailants. Fifth District Opinion at 3; R.T. at 447–48, 732. Allen was not advised that Almengor had selected the same three photographs. R.T. at 722.

## C.

During a taped portion of the interview on October 27 Almengor described the three assailants for Lieutenant King and Officer Higgins. R.T. at 969–71. He stated that they wore state-issued jackets, black gloves, and knitted blue Navy watch caps. R.T. at 969. The man he fought with, he said, had a thick mustache, and the man with the large knife had a thicker mustache and was dark complected—"he looked like an Indian, more or less, like an Indian dude." R.T. at 970. At trial eight months later Almengor repeated his description, adding that the man with the large knife was tall and had a thick, solid black mustache. R.T. at 376, 416, 417, 419–20, 424, 479. However, he could not recall at trial if the man he fought with, whom he had identified as Mata, had a mustache. R.T. at 479. Almengor identified Mata and Gallegos in court as two of the assailants, R.T. at 374–75, but testified that he had been mistaken in his earlier identification of Vargas as the tall assailant with the large knife. R.T. at 501–02. Vargas, Almengor testified, was not as tall as the third attacker he saw. R.T. at 419.

Allen testified at trial that all three assailants wore state-issued clothes, gloves, and blue knit caps and had mustaches. R.T. at 621–22. However, in describing them to the defendants' private investigator on November 22, 1972, Allen stated that only one of the assailants had a mustache. R.T. at 1117–18. Also, he said he was not sure if they were Chicano or Caucasian. R.T. at 1118. Like Almengor, Allen made in-court identifications of Mata and Gallegos and testified that he had been mistaken in his earlier identification of Vargas. R.T. at 587, 623–24.

The 15 photographs shown to Allen and Almengor on October 30 included 10 men with mustaches, six of whom were pictured in state clothes. Three of those six photographs were the updated photographs of the defendants, while the other three photographs were less than a year old. Although taken at different times, most of the 15 photographs in the group were similar in terms of size, color, and pose. All of the inmates pictured were of Mexican descent.

## D.

At trial Allen testified that prior to his making an identification, officers brought up with him the subject of his upcoming appearance before the parole board. R.T. at 634–35. He testified that "[t]hey just said they would look at it, you know" and that "[t]hey said it wouldn't hurt." R.T. at 635. At the preliminary hearing he testified that prison officials said he could "be shipped" if he didn't cooperate. R.T. at 636. At trial he explained that this meant that if he didn't cooperate he might be sent "some other place" where he "[m]ight have a better chance of getting killed," "or ending up getting myself deeper in trouble." *Id.* Allen had also told the defendants' private investigator on November 22 that one of the reasons he made the identification on October 30 was that he felt there was pressure from the Department of Corrections. R.T. at 1119.

## III.

At trial the prosecution introduced evidence of the pretrial identifications by Allen and Almengor, as well as their in-court identifications of Mata and Gallegos, as part of its case-in-chief. *See* R.T. at 365–506, 582–657, 707–804, 903–71. At the conclusion of the three-week trial the jury found all three defendants guilty of murder in the first degree; each was sentenced to life imprisonment. On direct appeal they raised for the first time the issue of impermissibly suggestive pretrial photographic identification procedures. In addressing this contention on its merits, the Fifth District Court of Appeal, after briefly reviewing the facts, *see* Fifth District Opinion at 2–3, rejected the argument on the following basis:

Appellants argue that the witnesses Almengor and Allen were housed in the same segregation unit with appellants, that they were aware that appellants were removed from the segregation unit to have their pictures taken and that this

makes their identification inadmissible. But they make no showing, and the record supports none, that the witnesses were in fact influenced in their identifications by this action of the investigating officers.

. . . .

[W]e ... find that the photographs were available for cross-examination purposes at trial. We further find that there is no showing of influence by the investigating officers: that the witnesses had an adequate opportunity to view the crime; and that their descriptions are accurate. The circumstances indicate the inherent fairness of the procedure, and we find no error in the admission of the identification evidence.

Fifth District Opinion at 3–5.

We must accord the factual findings of the Fifth District the presumption of correctness required by 28 U.S.C. § 2254(d).[1] *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982). Unless one of the eight exceptions listed in section 2254(d) is found, *e.g.,* that a finding

is "not fairly supported by the record," we must defer to the state court's findings. *Id.* at 1307.

We have presumed correct the Fifth District's description of the stabbing incident and the subsequent photographic identification procedures, contained at pages 2–3 of its opinion, and have incorporated those findings into our foregoing recitation of the facts. *See* part II *supra.* We conclude, however, that the Fifth District's rather sketchy account did not adequately develop the material facts concerning the witnesses' observations of the incident and the photographic procedures later employed by prison authorities. Therefore, our detailed account of the facts in part II *supra* includes additional facts and testimony, fairly supported by the record, that are material to the issue of photographic identification.

We have also examined the findings contained in the portions of the Fifth District's opinion quoted above and recognize, in accordance with the opinion of the Supreme Court, 102 S.Ct. at 1305, that certain of the

1. Section 2254(d) provides:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issues was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C. § 2254(d).

findings therein are considerably at odds with the characterization of the facts in our earlier opinion. *See Mata v. Sumner,* 611 F.2d 754, 758–59 (9th Cir.1979). In facing up to that conflict, 102 S.Ct. at 1307, we now specifically hold that certain of the Fifth District's findings are not fairly supported by the record and, therefore, need not be accorded the presumption of correctness mandated by section 2254. *See* 28 U.S.C. § 2254(d)(8); *Sumner,* 102 S.Ct. at 1307. In the following section we evaluate these findings in connection with the factors to be considered in determining the constitutionality of the pretrial identification procedures used in this case—a mixed question of law and fact not governed by section 2254. *See* 102 S.Ct. at 1306.

## IV.

■ Suggestive pretrial photographic identification procedures may taint in-court identifications sufficient to deny the accused due process of law. *United States v. Field,* 625 F.2d 862, 865 (9th Cir.1980). As well, the admission of testimony concerning the out-of-court identification itself may work to deny due process. *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). In both situations the identification evidence must be excluded "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir.1982); *Field,* 625 F.2d at 865. *See Biggers,* 409 U.S. at 198, 93 S.Ct. at 381 ("irreparability" is considered only in context of in-court identifications).

■ Our review of the trial court's admission of the in-court and out-of-court identification testimony must focus exclusively on the reliability of the identifications in light of the totality of surrounding circumstances. *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977); *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382; *Simmons,* 390 U.S. at 382, 88 S.Ct. at 970; *Field,* 625 F.2d at 865–66. We must weigh the "corrupting effect" of the challenged identification procedure against indicia of the witness' ability to make an accurate identification. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382; *Field,* 625 F.2d 867–68. Applying these standards to the facts fairly supported by the record in this case, we conclude that the state employed photographic identification procedures so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.

### A.

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court enunciated five factors that reflect a witness' ability to make an accurate identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. at 382. Each of these factors requires a finding of historical fact to which section 2254 applies. *Sumner v. Mata,* 102 S.Ct. 1303, 1307 n. 10 (1982). We now consider the *Biggers* factors in light of the trial court record and the Fifth District's findings.

### 1. *Opportunity to View*

The Fifth District found that "the witnesses had an adequate opportunity to view the crime." Fifth District Opinion at 5. The relevant inquiry, however, is the witness' opportunity to view the *criminal. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. We conclude that, at least with respect to witness Allen, the witness had *no* opportunity to observe the assailant later identified as Mata. To the extent the Fifth District's finding can be construed to be contrary, it is not fairly supported by the record. 28 U.S.C. § 2254(d)(8). Allen consistently testified that he did not see the person Almen-

gor was fighting (allegedly Mata). Allen was preoccupied with the tall man who lunged at him with a large knife (allegedly Vargas). After Allen backed away from this man he turned to yell for help and never again saw the assailants' faces. *See* part II(A) *supra.*

Almengor's opportunity to view the assailant he identified as Mata was somewhat better. After fist-fighting with this man Almengor faced him "eye-to-eye" for "several minutes, several seconds." However, Almengor was not wearing his glasses at the time, and the entire incident lasted no longer than a few minutes. *See id. Cf. United States v. Williams,* 626 F.2d 697, 703 (9th Cir.), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980) (witness viewed bank robber for about 20 minutes at "close quarters"); *United States v. Field,* 625 F.2d 862, 865 (9th Cir.1980) (witness viewed bank robber for only one minute from 2–3 feet; identification testimony held tainted). If the Fifth District can be said to have described this as an "adequate" opportunity to view the criminal, that description is supported by the record. "Adequate," however, is a finding hardly specific enough upon which to rely in reaching a conclusion that must be based on the totality of the circumstances. *Manson,* 432 U.S. at 113–14, 97 S.Ct. at 2252–53. Therefore, we consider the specific details of Almengor's encounter with the assailant, *see* part II(A) *supra,* to be fairly supported by the record and to be relevant to his "opportunity . . . to view the criminal at the time of the crime." *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382.

### 2. *Degree of Attention*

Since a witness' degree of attention bears on his opportunity to view the criminal at the time of the crime, this factor overlaps somewhat with the first *Biggers* factor. The Fifth District made no specific finding concerning the witness' degree of attention, although such a finding might be considered implicit in its finding that the witnesses had an "adequate opportunity to view the crime."

As noted above, Allen focused his attention on the assailant in front of him, not the man identified as Mata. Almengor, however, paid a great degree of attention to the assailant he identified as Mata since the two had fought and then had stood looking directly at each other. *See* part II(A) *supra.*

### 3. *Accuracy of the Prior Description*

The Fifth District found that the witnesses' "descriptions are accurate." To the extent this finding can be substantiated by reference to the trial court record, it is not fairly supported by the record in several respects. Almengor initially described only two of the assailants as having mustaches; all three defendants, however, had mustaches on October 27, 1972. Allen initially stated that only one of the attackers had a mustache. Both witnesses changed their stories at trial and testified that all three assailants had mustaches. *See* part II(C) *supra.*

A related and more relevant inquiry is the certainty and detail with which the witnesses described the assailants. *See Washington v. Cupp,* 586 F.2d 134, 137 (9th Cir.1978), *cert. denied,* 441 U.S. 909, 99 S.Ct. 2003, 60 L.Ed.2d 379 (1979) ("victim provided a specific and detailed description"). Here, although Almengor was able to describe the assailants' clothing and complexion, his description clearly was not detailed. *Cf. Biggers,* 409 U.S. at 200, 93 S.Ct. at 382 (description included assailant's approximate age, height, weight, complexion, skin texture, build, and voice); *Washington,* 586 F.2d at 137 (description included race, height, build, hair style, complexion, age, facial characteristics, and clothing). Allen's description was even less certain and detailed: he could not remember whether the attackers were Caucasian or Chicano. *See* part II(C) *supra.*

### 4. *Level of Certainty at Confrontation*

Again, the Fifth District made no specific finding concerning this factor. Allen and Almengor expressed no certainty about any of the photographs until the photographic

array on October 30. *See* part II(B) *supra.* The only person Almengor identified "positively"—Pete Nunez—was not even in the prison facility at the time of the attack. Six other "possible" identifications by Almengor were subsequently ruled out by prison officials. *Cf. United States v. Barron,* 575 F.2d 752, 754 (9th Cir.1978) (no indication that witnesses had ever selected any other suspect than defendant). Allen was so uncertain that he was unable to make even a "possible" identification until October 30. *See* part II(B) *supra.* The certainty demonstrated by Allen and Almengor on October 30 came only after prison authorities employed the pretrial identification procedures here at issue.

### 5. *Length of Time Between Crime and Confrontation*

Although prison investigators presented photographic arrays to Almengor on the day of the incident, and to Almengor and Allen eight days later, neither witness was able to make a positive identification. Not until October 30, eleven days after the stabbing, did Almengor and Allen identify the defendants' photographs. *See* part II(B) *supra.* While we have held that a lapse of one week between the incident and the confrontation is not enough alone to render an identification inadmissible, *see United States v. Hammond,* 666 F.2d 435, 440 (9th Cir.1982), the lapse of eleven days in this case is a factor to be considered in assessing the totality of the circumstances.

### B.

Against these indicia of the witnesses' ability to make an accurate identification we are to weigh the corrupting effect of the photographic identification procedures employed by the prison authorities. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

### 1. *Necessity of the Photographic Arrays*

In a number of this Circuit's previous eyewitness identification cases, and in our initial opinion in *Mata,* we stated that a two-step approach that focuses first on the *necessity* of the identification procedure employed is the proper inquiry in determining the admissibility of identification evidence. *See, e.g., Mata v. Sumner,* 611 F.2d 754, 757 (9th Cir.1979), *vacated and remanded,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *United States v. Peele,* 574 F.2d 489, 490 (9th Cir.1978); *United States v. Flickinger,* 573 F.2d 1349, 1358 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Collins,* 559 F.2d 561, 563 (9th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977); *United States v. Valdivia,* 492 F.2d 199, 210 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Baxter,* 492 F.2d 150, 171 (9th Cir.), *cert. dismissed,* 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973). *Cf. United States v. Crawford,* 576 F.2d 794, 797–98 (9th Cir.), *cert. denied,* 439 U.S. 851, 99 S.Ct. 157, 58 L.Ed.2d 155 (1978) (necessity for pretrial photographic identification procedures should be considered but not as a separate first step). The consideration of necessity apparently stemmed from language by the Supreme Court in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), suggesting that the propriety of using a photographic identification procedure was grounded in part on its necessity in the circumstances. 390 U.S. at 384–85, 88 S.Ct. at 971–72. *See Baxter,* 492 F.2d at 171 ("The *Simmons* Court suggested two standards by which the permissibility of pretrial photographic identification should be judged. The first is whether the use of photographic identification was necessary in the particular case.")

The Government's need to use an inherently less reliable method of identification, *e.g.,* photographic arrays, *see Simmons,* 390 U.S. at 386 n. 6, 88 S.Ct. at 972 n. 6, would be a relevant factor if the due process interest served by excluding identification evidence focused on the protection of an accused from the deliberate police use of suggestive identification measures. *Cf. Manson,* 432 U.S. at 111, 97 S.Ct. at 2251 (respondent urges that deterrence of improper identification practice is pre-eminent reason

for rule that excludes evidence resulting from unnecessarily suggestive identification procedures without regard to its ultimate reliability); *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) ("[U]nnecessarily suggestive [confrontations] are condemned for the further reason that the increased chance of misidentification is gratuitous.") Due process, in this sense, would justify exclusion of identification evidence on grounds analogous to the exclusion of evidence of coerced, but true, confessions: it is reprehensible police conduct—the needless use of suggestive identification measures that focus on the accused in order to secure a conviction—that due process of law prohibits.

> [W]hile an involuntary confession is inadmissible in part because such a confession is likely to be unreliable, it is also inadmissible even if it is true, because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will."

*Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981) (quoting *Jackson v. Denno,* 378 U.S. 368, 386, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908 (1964).

■ In *Manson,* however, the Supreme Court made it clear that in requiring the exclusion of identification evidence that results from suggestive identification procedures, the Due Process Clause protects solely an *evidentiary* interest, 432 U.S. at 113, 97 S.Ct. at 2252, an interest normally vindicated through the adversarial process of cross-examination, *id.* at 113–14 n. 14, 97 S.Ct. at 2252–53 n. 14. *See Simmons,* 390 U.S. at 384, 88 S.Ct. at 971. Due Process protects an accused by prohibiting a jury from hearing eyewitness testimony unless that evidence has aspects of reliability. *Manson,* 432 U.S. at 112, 97 S.Ct. at 2252. Thus, "reliability is the linchpin in determining the admissibility of identification testimony...." *Id.* at 114, 97 S.Ct. at 2253. Unlike reliable confessions obtained through police pressure, eyewitness identification testimony obtained through sugges-

tive and unnecessary procedures is nevertheless admissible if it retains "certain features of reliability." *Id.* at 110, 97 S.Ct. at 2251. *See Watkins,* 449 U.S. at 347–48, 101 S.Ct. at 658–59. "[W]hen improper police conduct ... does not taint the reliability of [the] witness' identification evidence, the defendant has nothing of which to complain." *United States v. Field,* 625 F.2d 862, 868 (9th Cir.1980).

■ Therefore, we conclude that the rationales of *Manson* and *Watkins* dictate that the need, or lack of it, for the identification procedures employed by the prosecution's officers plays no part in the determination of the admissibility of identification evidence, a determination that focuses solely on reliability. This does not mean, however, that we cannot consider the *fact* that the officers chose to use a less reliable identification procedure (*e.g.,* photographic array) over a normally more reliable procedure (*e.g.,* corporeal line-up). *See Simmons,* 390 U.S. at 386 n. 6, 88 S.Ct. at 972 n. 6. The mere fact that a less reliable method was used clearly bears on the extent of the corruptive effect of the identification procedure. We hold only that, because a defendant's due process interest in this context is only *evidentiary,* and concerned solely with reliability, the extent to which the officers *needed* to use a certain identification procedure cannot render eyewitness identification testimony admissible or, on the other hand, mandate its exclusion.

■ We find that prison authorities in this case chose to use photographic arrays, an identification procedure inherently less reliable than corporeal line-ups. *See Simmons,* 390 U.S. at 386 n. 6, 88 S.Ct. at 972 n. 6. "Even if the police ... follow the most correct photographic identification procedures and show [the witness] the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification." 390 U.S. at 383, 88 S.Ct. at 971. For the reasons discussed above, however, we do not consider relevant whether this procedure was necessary; we find only

that its relative unreliability in comparison with line-ups is a factor to be considered in the totality of the circumstances.

### 2. *Suggestive Identification Procedures*

In addition to the use of an inherently less reliable identification method, the record is replete with instances of suggestiveness in the identification procedures employed by prison officials. Almengor was shown photographs on not one, but three different occasions; Allen viewed photographs twice. Our statement in *United States v. Higginbotham*, 539 F.2d 17, 23 (9th Cir.1976) is apposite:

> While the repeated showing to a witness of photographic displays for the purpose of identification presents opportunities for abuse and due process problems, when it is shown that the witness was equivocal on the first selection and became firm on a latter showing, that rule should not be applied where the witness has been consistently firm.

In the final photographic array on October 30 prison authorities removed photographs that had been identified earlier by Almengor as "possibly" the assailants and drastically reduced the total number of photographs. The new photographs of the defendants were the only ones updated for the October 30 array, despite the fact that the defendants' photographs were among the most recent shown in the October 27 array. Allen and Almengor were housed in segregation with the defendants and saw them taken to have their pictures retaken; Allen stated at one point that because of this he assumed the three defendants were the participants in the stabbing. The Fifth District's finding that the record supports no showing that this action influenced the witnesses' identification is itself not fairly supported by the record in this case. 28 U.S.C. § 2254(d)(8). Finally, uncontradicted testimony by Allen shows that prison authorities brought pressure to bear upon him by threatening him with getting "shipped" if he didn't cooperate. The state court's finding that there was no showing of influence by the investigating officers is likewise not fairly supported by the record. 28 U.S.C. § 2254(d)(8).

### C.

Only after these actions by prison investigators did Allen and Almengor identify Mata and his codefendants as the assailants. Keeping in mind that our purpose is to "judge whether the identification was the product of observations at the time of the crime or impressions made during the suggestive pretrial photographic identifications process," *United States v. Field,* 625 F.2d 862, 866 (9th Cir.1980), we remain firmly convinced that the circumstances of this case show the latter. Giving due deference to those findings of the Fifth District that are fairly supported by the record, we hold that in the totality of the surrounding circumstances the pretrial photographic procedures employed here were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

The admission of the in-court identifications and evidence of the pretrial identifications of Mata by Allen and Almengor, therefore, was error. *See Field,* 625 F.2d at 869–70. Moreover, we cannot conclude that such error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Stubblefield,* 621 F.2d 980, 983 (9th Cir.1980); *Green v. Loggins,* 614 F.2d 219, 225 (9th Cir.1980). Although the prosecution introduced some circumstantial evidence of Mata's guilt, its case was based primarily on the pretrial and in-court identifications by Almengor, Allen, and a third witness. We cannot say admission of the identification evidence was harmless when we do not know which witness the jury may have believed. *Field,* 625 F.2d at 870.

Accordingly, the order of the District Court is reversed. Upon remand, the District Court will hold the Petition in abeyance for a period of ninety days, within which time the state prosecutors may, if they so choose, initiate a new trial against Mata, a trial in which prosecutorial evi-

dence barred by the Federal Constitution will not be introduced.

REVERSED and REMANDED, with directions.

SNEED, Circuit Judge, dissenting:

Reluctantly and respectfully I must dissent for the third time in this case.

Eleven courts have considered various aspects of petitioner Mata's claims. Only this court, on three separate occasions, has responded favorably.

Mata was convicted of first-degree murder in the Superior Court of Kern County, California. He appealed his conviction to the California Court of Appeal for the Fifth District, where he alleged for the first time that his constitutional rights were violated by the pretrial identification procedures discussed in the majority opinion. The California Court of Appeal affirmed the conviction, and made specific findings of fact concerning Mata's claims. Mata filed a petition for a writ of habeas corpus in the Superior Court of Marin County, California. That court denied the petition, as did the California Court of Appeal for the Fifth District and the California Supreme Court.

Finally, Mata sought collateral review in the federal courts. The district court refused to issue a writ of habeas corpus. This court twice gave judgment in favor of Mata, 611 F.2d 754 (9th Cir.1979); 649 F.2d 713 (9th Cir.1981), and twice had its opinion vacated and remanded by the Supreme Court, with instructions to comply with the requirements of 28 U.S.C. § 2254(d). *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ["Mata I"]; *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) ["Mata II"].

My present dissent, like its immediate predecessor, is shaped in part by the Supreme Court's immediately preceding remand. Thus, I now dissent because in my view the findings of fact in the state proceedings before the California Court of Appeal are "fairly supported by the record" as required by 28 U.S.C. § 2254(d)(8). Also I continue to insist that the pretrial identifi-

cation procedures were not impermissibly suggestive and that any error in the identification of Mata that might have existed was harmless. Finally, I reject the majority's view that the failure to hold a lineup deprives the petitioner of his constitutional due process rights.

### I.

### THE APPLICATION OF SECTION 2254(d)(8)

*A. Section 2254(d)*

To minimize the friction that inevitably has resulted from federal habeas corpus review, and to show respect for principles of comity and federalism, Congress, as the Supreme Court explained in *Mata I,* in 1966 enacted 28 U.S.C. § 2254(d) as an amendment to the Federal Habeas Act of 1867. 449 U.S. at 550, 101 S.Ct. at 770, 66 L.Ed.2d 722; *Suggs v. LaVallee,* 570 F.2d 1092, 1112 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978). Under section 2254(d), as the Supreme Court stated in *Mata I,* and repeated emphatically in *Mata II,* a federal court engaged in habeas corpus review of a state decision *must* presume the findings of fact made in the state court system to be correct.

Two exceptions to this presumption exist. First, the federal court may disregard the state findings of fact if the habeas corpus petitioner can prove "by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d). Proof by "convincing evidence" is a burden more rigorous than the "preponderance of the evidence" standard. 449 U.S. at 551, 101 S.Ct. at 770. Second, the federal court may defeat the presumption of correctness if it finds that the requirements of section 2254(d)(1)–(7) or section 2254(d)(8) are satisfied. If the federal court bases its decision on this second exception, it is obliged to explain *specifically* the reasons for its conclusion. 102 S.Ct. at 1307; 449 U.S. at 552, 101 S.Ct. at 771.

Moreover, a finding by the reviewing court that one of these exceptions applies to a particular finding of fact does not relieve that court of the duty to defer to the state

court's other findings of fact. The federal court is not free to put aside its obligation to defer to these other findings merely because another *particular* state finding is held not to be fairly supported by the record. The majority recognizes this in Part III of its opinion. *See also Harris v. Pulley,* 692 F.2d 1189, 1199 (9th Cir.1982).

B. *Exceptions to Section 2254(d)*

It is clear from *Mata II* that if the facts found in the Fifth District Opinion are correct, there is no support for the majority's conclusion that a deprivation of due process rights has taken place. *See* 102 S.Ct. at 1306–07 & n. 6. Thus, the majority in the final analysis must rely on an exception to section 2254(d) to support its holding.

The "convincing evidence" exception to section 2254(d) cannot apply here. Five courts have found that the state findings of fact was correct, and the Supreme Court has twice had the opportunity to uncover such "convincing evidence," but has declined to do so. Moreover, the majority has not pointed to any "convincing evidence" in the three times that this case has been before us; indeed, on the previous remand, the majority found that it was "substantially" in agreement with the state court's factual findings. 649 F.2d at 717.

The majority therefore looks to section 2254(d)(8) to escape the presumption that the Fifth District's findings of fact are correct. Majority Opinion at 1251. Under this section the presumption of correctness of state court findings of fact can be disregarded where the federal court, after a review of the record of the state proceeding, concludes that the record "does not fairly support" the state findings. No other basis for refusing to defer to state findings of fact is available to the majority.

The majority appears to assume that a record "does not fairly support" the state court when a federal reviewing court disagrees with the state court's interpretation of the record. *See* Majority Opinion at 1250–1251. Such a construction fails to give due deference to a state court's factual determination and to reflect the intent of Congress in enacting section 2254(d)(8). *See* pp. 1256–1257 *supra.*

Section 2254(d) was promulgated in response to *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and it is to that case that one must turn when seeking the meaning of the statute. *See Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *see also* 649 F.2d at 716 n. 6. *Townsend* refers us to *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), and *Fiske v. Kansas,* 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927), for the meaning of "fairly support." *See* 372 U.S. at 313, 316, 83 S.Ct. at 757, 758. According to these cases, a finding is not fairly supported by the record if it is "shown by the record to be without evidence to support it." 274 U.S. at 385, 47 S.Ct. at 656. *See also* 361 U.S. at 208–09, 80 S.Ct. at 280–81 (a finding "without any evidence in the record" is not fairly supported by it).

Thus, to apply section 2254(d)(8) properly one must ask whether there is *any evidence* in the record to support the state court's finding of fact. Moreover, when the record is searched for support for the state findings, it embraces the entire record. It is not limited by the text of the state opinion, as the majority assumes. Majority Opinion at 1250–1251. *See Townsend v. Sain,* 372 U.S. at 314–15, 83 S.Ct. at 757–58; *Fowler v. Jago,* 683 F.2d 983, 987 (6th Cir.1982). If any evidence that fairly supports the state finding can be found in the record, the federal court *must* presume the state finding to be correct, in the absence of invocation of the "convincing evidence" exception previously discussed.[1] *See United States ex rel. Jones v. Franzen,* 676 F.2d 261, 264–65 (7th Cir.1982). *See also United States v. Warden, Illinois State Penitentiary,* 566 F.2d 28, 30 (7th Cir.1977) (a federal court

---

1. *Piche v. Rhay,* 422 F.2d 1309 (9th Cir.1970), the only Ninth Circuit case to address this issue, noted that a federal court must accept the findings of a state trier of fact if the state findings are reliable—that is, "supported by substantial evidence." *Id.* at 1311. While *Piche* might have adopted a more rigorous standard of review than that of *Townsend v. Sain,* it is irrelevant for the purposes of this

should defer to a state court finding of fact, "particularly when a state appellate court has made an independent factual review of an adequate record"); *Hardeman v. California,* 445 F.2d 258, 259 (9th Cir.) (Ely, J.) ("A full and fair evidentiary hearing on this was conducted by the California courts, and the District Court was thus entitled to accept the factual determination of the state courts"); *cert. denied,* 404 U.S. 998, 92 S.Ct. 572, 30 L.Ed.2d 550 (1971).[2] Finally, to invoke section 2254(d)(8) to overcome the presumption of correctness, a federal court must give a satisfactory explanation for its decision. *Mata II,* 102 S.Ct. at 1307.

In the remainder of this portion of my dissent I shall analyze the record in a manner consistent with these principles.

## C. *The Record Fairly Supports the State Court's Findings*

The Supreme Court in *Mata II* distinguished between the underlying "historical

facts" and the application of law to those facts in considering a habeas corpus petition under 28 U.S.C. § 2254(d). 102 S.Ct. at 1306–07. Making this distinction is not always easy and infrequently can be done without some dispute. However, it is legitimate to characterize the following key sentence of the California Court of Appeal's opinion as a recitation of findings of "historical facts":

We find further that there is no showing of influence by the investigating officers[;] that the witnesses had an adequate opportunity to view the crime; and that their descriptions are accurate.

Excerpt of Record at 82–83. The record clearly supports each of these three findings.[3]

### 1. *No Showing of Influence by the Investigating Officers*

The record establishes that Almengor was not subjected to any pressure to make an

---

case, since there is more than "substantial evidence" to support the Fifth District Opinion.

2. In *Lonberger v. Jago,* 651 F.2d 447 (6th Cir. 1981), a case similar to the present one, the court concluded that the state court's finding that the petitioner's guilty plea was involuntary was not fairly supported by the record. The court did not, however, seek support for the state court finding before reaching its decision. The Supreme Court has granted certiorari. 454 U.S. 1141, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982).

3. The Fifth District Opinion is a 16-page document covering a number of constitutional and evidentiary challenges to the convictions of Mata and his co-defendants. The relevant sections, annotated with references to the record, state:

I. *The Photographic Lineup Procedure.*

Both appellants Gallegos and Mata contend that there were prejudicial errors in the pretrial identification of them by certain prosecution witnesses.

Three inmate witnesses testified that they saw the stabbing take place. All three—Childress, Almengor, and Allen—identified all three defendants; but their testimony is attacked by appellants Gallegos and Mata on the basis of claimed improper pretrial photographic identification procedures. The witnesses were shown a number of photographs of Tehachapi inmates in an attempt to identify the slayers. Almengor was interviewed and shown photos on October 19, 1972, the day of the incident. [R.T. at 397, 422]. He made a possible identification of appellant

Vargas [R.T. at 423], but made possible misidentifications of the other two participants. [R.T. at 712–13, 766]. On October 30, 1972, more recent photos were presented to Almengor and he identified all the appellants. [R.T. at 402, 718]. On October 27, 1972, Allen was shown photographs but stated he could not make an identification because the photographs were old. [R.T. at 595, 721]. On October 30, 1972, more photos were presented to Allen and he identified all three appellants. [R.T. at 722]. . . .

Appellants argue that the witnesses Almengor and Allen were housed in the same segregation unit with appellants, that they were aware that appellants were removed from the segregation unit to have their pictures taken and that this makes their identification inadmissible. But they make no showing, and the record supports none, that the witnesses were in fact influenced in their identifications by this action of the investigating officers.

. . . *[A] violation of due process occurs and a conviction will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (See Simmons v. United States). . . .*

Reviewing the facts of the present case to determine if the particular photographic identification procedure used contained the proscribed suggestive characteristics, we first find that the photographs were available for cross-examination purposes at the trial.

identification of the assailants. Lieutenant King testified that Almengor was not told that he was a suspect in the slaying, and that Almengor was never threatened in any way with being charged with the crime. R.T. at 764–65. The only promise made to Almengor was that he would be protected, and the possibility of withholding Almengor's parole was not a consideration when he was interrogated. R.T. at 726–28. Almengor confirmed that he was promised nothing and was not threatened by the investigating officers. R.T. at 751.

Allen's testimony also shows that he was neither promised anything nor threatened by the investigating officers. R.T. at 649–50, 800. Parole considerations did not affect his actions. R.T. at 969. Allen's initial hesitation about participating in the investigation of the murder was caused by his reluctance to get involved. Allen testified:

> Q: Now, when you were telling the correctional officers the Sheriff's officers that you couldn't identify anybody, and they showed you pictures that you couldn't identify, and you couldn't identify anybody, were you telling the truth to them, or were you just trying to not get involved?
>
> A: Just trying to not get involved.
>
> Q: When you finally identified three people from pictures, like you told us before, were you at that time doing your honest best to identify the people who actually were involved?
>
> A: Yes, sir.
>
> Q: Did the correctional officers or the Sheriff's officers try to tell you or attempt to tell you in any way who you should identify?
>
> A: No. They just had a bunch of pictures laid out.

R.T. at 650.

The majority admits that the array from which the identifications were made was composed of photographs that were "similar in terms of size, color, and pose. All of the inmates pictured were of Mexican descent." Majority Opinion at 1249. There was no allegation that any suggestive procedures were employed during the identification sessions.

The majority argues, however, that Almengor and Allen were influenced by seeing the prison authorities remove the three defendants from segregation to have their photographs taken. Almengor's testimony shows that he did not see Mata on his way to the photographer, R.T. at 444–46, and Allen could not recall saying to the defendants' private investigator that he had witnessed the incident. R.T. at 634. Moreover, the California Court of Appeal found that the record does not show that Almengor and Allen were influenced in any way by the incident, even assuming that they had seen it.

### 2. The Witnesses Had an Adequate Opportunity to View the Crime

Almengor had an excellent opportunity to see both Mata and the crime itself. Almengor testified that he was "reasonably close" to Mata at the time of the murder, R.T. at 391, was opposite him, R.T. at 742–43, and looked him in the face. R.T. at 382. Almengor said that he saw Mata stab at the victim, R.T. at 393, and "sloop over." *Id.*

---

[R.T. at 712–17]. We further find that there is no showing of influence by the investigating officers [R.T. at 649–50, 726–28, 751, 764–65, 800, 953, 968–69] [;] that the witnesses had an adequate opportunity to view the crime [R.T. at 381–82, 391–93, 439, 453–56, 586, 593–94, 624–26, 741–42, 801–02]; and that their descriptions are accurate. [R.T. at 375–76, 391–93, 419, 510, 586–94, 621–24, 658–72, 801, 969–71]. The circumstances thus indicate the inherent fairness of the procedure, and we find no error in the admission of the identification evidence.

Excerpt of Record at 81–83 (emphasis in original). The Fifth District also found in confirmation of the eyewitness testimony that:
> ... Eye witness testimony placed all of the appellants at the scene of the murder and participating in it. [R.T. at 279, 375–83, 510, 587]. Physical evidence, including gloves, a knife, and a jacket with blood on it were found. [R.T. at 658–61, 670–72].

*Id.* at 92.

Almengor then fought hand-to-hand with Mata "all the way up the dorm." R.T. at 381, 393, 453–56.

Allen had less of an opportunity to see Mata, since Vargas had attacked Allen when he tried to intervene in the assault. R.T. at 624–26. But Allen did get some view of the three attackers, R.T. at 586, 593–94, and was able to describe their appearance. R.T. at 621–22.

### 3. *The Witnesses' Descriptions Were Accurate*

Almengor described the height, weight, build, complexion, and clothes of Mata. R.T. at 375–76, 419, 969–71. *See* note 11 *infra*. Almengor also gave a description of the details of the crime, including Mata's exact movements during the entire assault. R.T. at 391–93. Allen also described the clothes of the assailants, as well as the attack, and had seen enough of the fight to recognize the attackers later by their photographs. R.T. at 585–94, 801, 1117. Other testimony confirmed details of these descriptions. *E.g.*, R.T. at 510, 658–62, 1176–77. The California Court of Appeal found that the witnesses' descriptions were accurate, the only evidence to the contrary being the testimony of defendants' private investigator concerning a possible variation in two details of Allen's testimony. R.T. at 1117–18.

### 4. *Conclusion*

I conclude that each of the three findings of the California Court of Appeal is supported by the record. The presumption of correctness provided by section 2254(d) attaches to these findings. The majority errs in not recognizing this. *See Townsend v. Sain*, 372 U.S. 293, 313–16, 83 S.Ct. 745, 757–59, 9 L.Ed.2d 770 (1963).

### II.

### SUGGESTIVE IDENTIFICATION CLAIM

A. *An Application of the Underlying Facts Does Not Establish a Due Process Violation*

As the Court put it in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d

140 (1977), "reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Id.* at 114, 97 S.Ct. at 2253. But while "reliability" may be the inquiry's "linchpin," a reviewing court must remember that, as a "linchpin" serves to keep the wheel from slipping off the axletree, so "reliability" is but the key to ensuring that no due process violations occur. The fundamental issue remains whether the facts establish a due process violation. *See* Part IV *infra*.

The reliability of an identification is determined by reference to the five factors set out in *Neil v. Biggers*, 409 U.S. 188, 199–20, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972). These include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *See Mata II*, 102 S.Ct. at 1307 n. 10; *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. I shall consider each of these factors.

### 1. *Adequate Opportunity to View*

The California Court of Appeal found that the witnesses had an adequate opportunity to view the "crime," and, as pointed out above, there is evidence in the record to support that finding. The majority contends that the *Neil v. Biggers* test refers to the opportunity to view the "criminal," not merely the "crime." Assuming, arguendo, the majority is correct, it does not follow that the state court finding is entitled to no deference. It is entitled to deference if it is supported by the record as a whole. *See Townsend v. Sain*, 372 U.S. at 314–15, 83 S.Ct. at 757–58. The record shows that both Almengor and Allen saw the three men involved in the attack as well as the crime itself. R.T. at 392–93, 586.

Admittedly, Allen could not see all three assailants well. R.T. at 586. But the majority's reference to Allen's statement after

the assault that he saw nothing should be viewed in the context of Allen's initial refusal to talk to the authorities about the crime. *See* R.T. at 631, 649–50.

The majority concedes, however, that Almengor's opportunity to view Mata was "adequate," but argues that adequacy is "a finding hardly specific enough upon which to rely in reaching a conclusion that must be based on the totality of the circumstances." Majority Opinion at 1252. This will not do. *Neil v. Biggers* requires no more than an "adequate opportunity." If the opportunity was adequate, that factor in the test is satisfied. Such satisfaction cannot also indicate a violation of Mata's due process rights. *See Mata* II, 102 S.Ct. at 1306 n. 6.

### 2. Degree of Attention

The majority is correct when it states that Almengor paid a great deal of attention to the assailant he identified as Mata, but that Allen focused his attention on the attacker in front of him.

### 3. Accuracy of the Prior Description

The California Court of Appeal found that the descriptions of both witnesses were accurate. There is evidence in the record to support that finding. R.T. at 375–76, 391–93, 419, 510, 586–94, 621–24, 741–42, 801–02.

### 4. Level of Certainty at Confrontation

The state court found that Almengor made three "possible" identifications on October 19—not "positive" identification, as the majority claims. Majority Opinion at 1252–1253. And since no photograph shown to the witness before October 30 resembled Mata's appearance at the time of the assault, the witnesses understandably were "uncertain," *id.*, as the state court indicates.

The state court found that both Almengor and Allen identified Mata on October 30—the first time that the witnesses were shown a recent photograph of him. *See my first dissent,* 611 F.2d at 761 (Sneed, J., dissenting). The record shows that the October 30 identifications of Mata were "positive." R.T. at 718–22.

### 5. Length of Time Between the Crime and the Confrontation

The California Court of Appeal found that eleven days passed between the date of the crime and that of the identification of Mata. The majority concedes that the lapse of a week does not render an identification unreliable. Nor does eleven days. *See United States v. Hammond,* 666 F.2d 435, 440 (9th Cir.1982). *See also United States v. Scriber,* 499 F.2d 1041, 1046–47 (D.C.Cir.1974) (identification 11 days after crime is reliable); *United States v. Kulp,* 365 F.Supp. 747, 758–59 (E.D.Pa.1973), *aff'd mem.,* 497 F.2d 921 (3d Cir.1974) ("several weeks").

### 6. Summary

This examination of the *Neil v. Biggers* test in the light of the section 2254(d) presumption of correctness shows that the *Neil v. Biggers* test is satisfied, and that the identifications are reliable. The California Court of Appeal found that both Almengor and Allen had an adequate opportunity to view the crime and described the assailants accurately. Both witnesses made positive identifications of Mata at the first opportunity to do so, and the identification took place reasonably soon after the crime. Almengor, it is true, paid much more attention to Mata than did Allen, but that should not render Allen's testimony unreliable. *United States v. Hammond,* 666 F.2d at 440 & n. 2.

### B. There is No Need to Balance the "Corrupting Effect" of the Identification Procedure in this Case

The majority weighs the reliability of the identifications against "the corrupting effect of the photographic identification procedures employed by the prison authorities." Majority Opinion at 1253. The majority bases this balancing test on the language of *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). The majority, however, misunderstands the "corrupting effect" test.

The *Manson* Court held that the reviewing court must weigh against the *Neil v. Biggers* factors "the corrupting effect of

the *suggestive* identification itself." *Id.* (emphasis added). Weighing is not required when the identification is not "suggestive" although prudence suggests that weighing might well accompany all identifications. "Suggestive identifications" can occur in the case of a single photograph shown to a witness for identification, *id.* at 116, 97 S.Ct. at 2254, a photographic array designed to make the identification the result of impressions gained during the identification process rather than during the crime, *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir.1982), or a one-person "showup." *Styers v. Smith,* 659 F.2d 293, 297 (2d Cir.1981). In contrast, the *Manson* Court expressly approved a photographic array including a reasonable number of persons who resemble the suspect, 432 U.S. at 117, 97 S.Ct. at 2254, precisely the type of array used in the identification of Robert Mata. *See* 611 F.2d at 756.

Nonetheless, the majority finds that the identification procedures in the present case were "suggestive." The majority makes six allegations to support its finding of suggestiveness. These are (1) that Almengor was shown photographs on three occasions, (2) that photographs previously identified by Almengor as "possible" were removed from the array, (3) that the array was reduced in size, (4) that the defendants' photographs were the only ones updated for the October 30 array, (5) that Almengor and Allen saw Mata being taken out to be photographed, and (6) that the prison authorities put pressure on Allen to cooperate. Majority Opinion at 1255. The finding of the majority is impermissible under a proper reading of § 2254(d).

To begin with, a finding of suggestiveness or no by a state court is a mixed question of law and fact, to which the reviewing court must defer unless an exception to section 2254(d) is applicable. *Mata* II, 102 S.Ct. at 1306–07. The state court here found the identification to be fair and not suggestive. No exception to section 2254(d) is available. The record supports the state court's findings.

First, Almengor was shown a photographic array on three occasions because, as it turned out, there were no up-to-date, and

therefore identifiable, photographs in the earlier arrays of the men later picked out by Almengor as the assailants. R.T. at 595–96, 721–22. *United States v. Higginbotham,* 539 F.2d 17, 23 (9th Cir.1976), approves the showing of two different photographic arrays to a witness, while condemning "repeated" showings of the *same* photographic display in the hope that the witness eventually will identify someone—a situation not alleged here. *See also United States v. Brown,* 461 F.2d 134, 142–43 (D.C. Cir.1972) (en banc) (three arrays and a lineup before identification made is not suggestive).

Second, the two photographs identified by Almengor as "possible" were not included in the October 30 array because the persons identified could not have participated in the assault. Keeping the photographs in the array would not have advanced the search for truth.

Third, the reduction in the size of the photographic array is irrelevant, as long as the size is "reasonable," as this array was. *Manson,* 432 U.S. at 117, 97 S.Ct. at 2254.

Fourth, although the three defendants in this case were the only ones to have their photographs updated for the October 30 array, all of the photographs displayed on that day were reprinted so as to appear identical. R.T. at 716.

Fifth, Almengor did not see Mata being taken out to be photographed, R.T. at 444–45, and Allen may not have seen the incident. R.T. at 634. Moreover, the California Court of Appeal found that there was no showing by Mata that Allen was influenced by having seen Mata on his way to the photographer.

Finally, there is the question of undue police influence on Allen. The state court found that there was no showing of influence by the investigative officers on Almengor and Allen, and the record supports that finding. *See* Part I, *supra;* 611 F.2d at 760–61 (Sneed, J., dissenting). The federal court should presume this underlying finding of fact to be correct. *Mata* II, 102 S.Ct. at 1306–07.

Thus, I would acknowledge that the identification procedures employed by the inves-

tigative officers here were not, for the purposes of habeas corpus proceedings under section 2254, unduly "suggestive." Therefore these procedures had no "corrupting effect" that requires the weighing mandated by the *Manson* Court. However, a weighing of the non-suggestive procedures, as prudence dictates, against the *Neil v. Biggers* factors only strengthens my conclusion that the majority erred in granting Mata's petition. No due process violation occurred.

## III.

### ANY ERROR WAS HARMLESS

Finally, any error was harmless, beyond a reasonable doubt. The federal district

court so held.[4] The majority disregards that holding,[5] and finds that error was not harmless. Majority Opinion at 1255–1256. By so doing, the majority ignores the strongly inculpating evidence against Mata apart from the testimony of Allen, overestimates the dimensions of any error in Almengor's identification of Mata, and fails to evaluate properly the role of the jury in evaluating the evidence against Mata.

First, the majority does not mention that the testimony of the "third witness," Paul Childress, an inmate who knew Mata, positively identified Mata as taking part in the murder.[6] There was also testimony about a Mexican Mafia plot involving Mata to kill

**4.** The district court also found that any irregularities in the pretrial identification of Robert Mata did not amount to a violation of his constitutional rights.

The relevant portion of the district court opinion states: "On the merits, the Court concludes the petition must be denied. While petitioner has established that irregularities occurred in the pre-trial photographic identification of petitioner by witnesses Almengor and Allen, these irregularities did not so taint the in-court identifications of petitioner by these witnesses as to establish a constitutional violation under *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). *See United States v. Baxter,* 492 F.2d 150, 172 (9th Cir.1973), *cert. denied,* 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974)." Excerpt of Record at 95–96.

The district court's findings were on a mixed question of law and fact. *Mata* II, 102 S.Ct. at 1306. As such, they are entitled to deference on our part. At the moment, we apply a "clearly erroneous" standard of review to a district court's finding in a mixed question of law and fact. *Maxwell v. Sumner,* 673 F.2d 1031, 1035–36 & n. 5 (9th Cir.1982).

The majority does not address the standard of review of the district court opinion, and therefore does not explain why it has chosen not to defer to the district court. It should have done so.

The district court did not, of course, have the benefit of guidance from the Supreme Court on the importance of 28 U.S.C. § 2254(d), as did the majority in its previous and present opinions. The district court, therefore, did not explain whether it complied with section 2254(d) in evaluating the Fifth District Opinion, or

whether it made a *de novo* examination of the record.

As I noted in my second dissent in this case, it might be sensible to remand this case to the district court to give Mata the opportunity there to rebut the Fifth District's findings. 649 F.2d at 718 (Sneed, J., dissenting). As our three-fold consideration of Mata's claims vividly illustrates, it is not in the interests of judicial economy to have a Court of Appeals review the facts of this type of petition when a district court is equally able to do so.

**5.** The district court stated that "even if the testimony of Allen was tainted, the positive identification of petitioner by witness Childress and the strong one by Almengor makes [sic] the error harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967)." Excerpt of Record at 96. It should be noted that the district court followed the same harmless error standard as the present majority. *See* Majority Opinion at 1255.

**6.** Respondents summarize this evidence: "Childress testified that he was acquainted with petitioner [Mata] and co-defendant Gallegos prior to the crime, (RT 268) that he witnessed the crime (RT 275–278) and he made in-court identifications of Mata, Gallegos and Vargas as the assailants (RT 279). Childress testified that on October 20, 1972, the day after the incident, he reported to Lieutenant Mills what he had witnessed and verbally identified Mata and Gallegos by their known names, "Biggs" and "David" (RT 284–285). Childress testified that he then identified all three defendants' photographs from the Rolodex of pictures of hun-

Arias, the victim.[7] And other testimony indicated that Mata had shown the testifying witness how Mata had "hit" the victim.[8] Moreover, a blood-stained jacket and knife were found in a locker near Mata's bed. R.T. at 658–62.

Second, the only meaningful defect in Almengor's identification of Mata is that Almengor did not pick Mata out of a photographic array until eleven days after the murder.[9] But Almengor's identification occurred the first time that he saw a recent photograph of Mata. Unlike Allen, Almengor did not see Mata being led out to have his photograph taken,[10] and there is no allegation that Almengor was subjected to any pressure on the part of the prison authorities to make an identification. As the district court put it, the identification of Mata by Almengor was "strong." Excerpt of Record at 96.

Finally, the majority cites to *United States v. Field,* 625 F.2d 862 (9th Cir.1980), for the proposition that any error in the identification of Mata could not be harmless because "we do not know which witness the jury may have believed." Majority Opinion at 1255. The majority misreads *Field* and the evidence in the present case.

In *Field,* the defendant was convicted on the basis of identifications by three witnesses. 625 F.2d at 865. The court held that two witnesses were subjected to unconstitutionally suggestive identification procedures and that the testimony of the third was highly unreliable. *Id.* at 668–70. The court concluded that any error could not have been harmless since there was no reliable witness who had identified the defendant as the criminal whom the jury could have believed.

---

dreds of inmates (RT 285–286). Lieutenant Mills testified that he isolated the photographs of Mata and Gallegos and Childress confirmed their identity and then again picked their photos from the Rolodex (RT 676–677). Childress testified that he never had any doubt about his identification of the three defendants (RT 286–287)." Respondent's Return to the Order to Show Cause and Points and Authorities in Opposition to Petition for Writ of Habeas Corpus, Excerpt of Record at 42.

**7.** "Carlos Ortega, the chief of the Mexican Mafia at Techachapi[,] testified that petitioner Mata and defendant Vargas, also members of the Mafia, contacted him and Mata told him that the victim was due to arrive at the prison, and they were ordered "to hit" the victim (RT 822–824). The next day, October 19, he and petitioner Mata and defendant Gallegos met, and they urged Ortega "to get down" meaning to arm himself with a knife and stab the intended victim (RT 82[8] ). Mata and Gallegos departed, and defendant Vargas approached Ortega. Mata and Gallegos returned, Mata tried to give Ortega a knife which Ortega identified as one of the murder weapons, and Mata said he had another knife in his belt (RT 8[29]–831). Ortega refused, and Vargas called him a "cry baby" in Spanish (RT 832).

"Ortega and Gallegos were among several inmates transferred to Tracy after the incident. En route, Gallegos said, "My knife broke when I hit him. We all worked out on it." (RT 83[8] )." *Id.* at 48.

**8.** "Joe Escobar testified that he is a member of the rival group, Nuestra Familia, the group to which the victim also belonged (RT 1154). Just

before the stabbing took place, Escobar saw petitioner and his two co-defendants walking toward dorm 8 where the stabbing took place (RT 1175–1178). Escobar saw co-defendant Gallegos a short time later; his face was flushed and he appeared excited (RT 1178). That evening Escobar saw petitioner Mata who motioned to himself and smiled, indicating that he had "hit" the victim (RT 1183–1184)." *Id.*

**9.** The majority also contends that Almengor's description of Mata to the police "clearly was not detailed." I fail to see how the majority reached this conclusion. Almengor described the height, build, weight, complexion, and clothes of Mata. R.T. at 419, 969–71. The description in *Neil v. Biggers,* characterized by the Court as "more than ordinarily thorough," 409 U.S. at 200, 93 S.Ct. at 383, only added to Almengor's list the age, skin texture, and voice of the suspect. *Id.* But even if the majority's contention were true, the *Neil v. Biggers* test refers us to the "*accuracy*" of the prior description, not the amount of detail in it. *Id.* at 199, 93 S.Ct. at 382; *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir.1982). *See Mata II,* 102 S.Ct. at 1306 n. 6. Moreover, the inadequacy—or even absence—of a pre-trial description of the defendant by a witness in this context carries little weight in deciding whether a pre-trial identification is "reliable." *See United States v. Hammond,* 666 F.2d 435, 440 (9th Cir.1982).

**10.** The majority's statement to the contrary, Majority Opinion at 1255, finds no support in the record. R.T. at 444–45.

That is not the case here. The witness Childress made a positive identification of Mata, and Almengor's testimony, especially taken in the context of the circumstantial evidence against Mata, is very strong. Allen's identification may be suspect, but his testimony is merely cumulative. Moreover, the majority says at most that Allen identified Mata out of fear of retaliation by the prison authorities, not out of a desire to cover up for someone else. *See* R.T. at 801. Such fear, even if it existed, provides no reason to assume that Allen's identification of Mata was incorrect.

Given the strength of the case against Mata, I conclude that the district court was correct in holding that any error is harmless beyond a reasonable doubt.

## IV.

### FAILURE TO HOLD A LINEUP

The majority holds that federal courts in this Circuit should consider police use of photographic arrays instead of lineups as a factor which "bears on the extent of the corruptive effect of the identification procedure" when deciding whether a pretrial identification violates a suspect's constitutional rights. Majority Opinion at 1254. According to the majority, this court should "consider the *fact* that the officers chose to use a less reliable identification procedure (*e.g.,* photographic array) over a normally more reliable procedure (*e.g.,* corporeal line-

up)." Majority Opinion at 1254 (emphasis in original). Presumably, such use suggests at least the possibility of a due process violation.

However, it is plain that an accused has no constitutional right to a lineup rather than a photographic array. *See United States v. Robertson,* 606 F.2d 853, 857 (9th Cir.1979). Nonetheless, the majority seeks to accomplish indirectly what the law explicitly rejects.

The majority effectively would force the police to abandon arrays in favor of lineups whenever possible. As Justice Stevens pointed out in *Mata II,* the issue the majority resolves has been "lurking in the background of this case." 102 S.Ct. at 1308 (Stevens, J., dissenting). I continue to dissent from this needless intervention into the identification procedures employed by the police.

I explained in my first *Mata* dissent, 611 F.2d at 760–61, that requiring the police to employ a lineup when investigating a crime committed in a prison would place a terrible strain on prison resources.[11] The majority now compounds the problem by making its principle apply with equal force outside the prison walls.

To the majority the price of due process compliance is unrelated to its substance. Majority Opinion at 1253–1255. In terms of logic the majority is correct. In terms of practical judgment the majority is wrong.

---

11. I wrote: "The prison setting of the crime for which appellant was convicted and the investigation thereafter by prison officials in my opinion dictate the use of photographic identification procedures. Apparently the majority insists as a matter of constitutional law that there be employed lineups of a large group of inmates, with each suspect, or more likely a substantial group of inmates, which would include the suspects, suitably equipped with counsel, in lieu of photographic identification procedures. *See* [611 F.2d at] p. 759 n. 1. To state the requirement reveals its impracticability. Moreover, it would impose heavy demands on the staff, strain employee relations, and expose the inmates to increased risks of bodily harm.

"The prison world is unique. It differs enormously even from the precinct station house and police headquarters. A "code of silence"

strengthened by taboos against "ratting" and a pervasive fear of retaliation are characteristics of the prison social order. In this environment prison administrators and guards must function. Administrators are responsible for protecting prisoners in their custody and may be held liable for a failure to provide such protection . . . . Guards, directly responsible for prison order and security, jealously husband their stock of authority and seek to avoid any confrontation that will deplete that stock . . . . To require the type of lineup the majority envisions in this setting is to insist upon jeopardizing the security and safety of all as the price of securing the constitutional protection that the majority holds appellant is entitled. We should be reluctant to fashion constitutional doctrines whose price is so dear." 611 F.2d at 760–61 (citations omitted).

The courts cannot fashion rules to govern police conduct in a vacuum. We must take into account the dangers that both police and prison authorities face, and the role that those groups play in preserving the fabric of society in shaping the contours of constitutional due process. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 22–24, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968). No judge with whom I am acquainted would assert, when pressed, to the contrary.

The Supreme Court has never said that identification by means of a photographic array including "so far as practicable . . . a reasonable number of persons similar to any person then suspected," *Manson v. Brathwaite,* 432 U.S. at 117, 97 S.Ct. at 2254 (citation omitted), is contrary to constitutional due process. Rather, the *Manson* Court recommended the use of an array substantially identical to that employed in the identification of Robert Mata. *Id.* The Court in *Simmons v. United States,* 390 U.S. 377, 386 n. 6, 88 S.Ct. 967, 972 n. 6, 19 L.Ed.2d 1247 (1968), did suggest in dictum that some types of photographic arrays might be less accurate than a lineup, but the *Simmons* Court did not find a due process violation even with an array of just six photographs. *Id.*[12]

The fact remains that the Supreme Court since *Simmons* has never forbidden the use of an array of photographs for identification, has never held unconstitutional such an identification procedure, and has never held that the use of an array constitutes a suggestive identification technique having a corrupting effect on identification testimony. *See, e.g., Tibbs v. Florida,* —— U.S. ——, 102 S.Ct. 2211, 2213 n. 2, 72 L.Ed.2d 652 (1982); *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

The majority's holding therefore goes far beyond the Supreme Court's photographic array decisions. It beckons to the Supreme Court to follow after its lead; but I had always thought our duty was to follow the

way marked out by the Supreme Court, not to lead it, even when our way might appear to us to be the true path of righteousness.

---

12. The array in *Simmons* was therefore smaller than the arrays used in the identification of Mata. Moreover, I doubt whether the present membership of the Court would agree with the *Simmons* Court's dictum on photographic arrays. *See, e.g., United States v. Ash,* 413 U.S. 300, 319–21, 93 S.Ct. 2568, 2578–79, 37 L.Ed.2d 619 (1973).