**Deone Edward WASHINGTON, Petitioner-Appellant,**

v.

**Hoyt C. CUPP, Superintendent, Oregon State Penitentiary, Respondent-Appellee.**

No. 77–4022.

United States Court of Appeals, Ninth Circuit.

Nov. 13, 1978.

Howard R. Lonergan (argued), Portland, Or., for petitioner-appellant.

Melinda L. Bruce (argued), Salem, Or., for respondent-appellee.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.

CHOY, Circuit Judge:

Deone Washington was convicted in Oregon state court of attempted rape in the first degree. The state court of appeals affirmed the conviction. *State v. Washington*, 24 Or.App. 321, 544 P.2d 626 (1976). After exhausting state remedies, Washington sought a writ of habeas corpus in federal district court. Washington contended that police suggestions at a hospital identification procedure made later identifications by the victim inevitable, rendering their admission at his trial violative of due process. The district court adopted the magistrate's recommendation that the writ should be denied. We affirm.

I. *Facts*

On March 10, 1975, between 6:30 and 6:45 a.m., a woman was assaulted while taking a shower in a dormitory at Lewis and Clark College in Portland. Her assailant pulled her from the shower, pressed a knife against her side, and attempted to rape her. The episode lasted five to ten minutes before she was able to escape.

At approximately 7:20 a.m. the police arrived at the college. The victim described her assailant as a black male in his early twenties, five feet ten inches tall, medium to heavy build, with a round face, medium complexion, prominent cheek bones, and a high Afro haircut, wearing gray sweatpants, a dark green army jacket-type shirt, a yellow headband, and black gloves.

At 7:00 a.m. Officer Glankler stopped Washington's car about eight to twelve

* The Honorable Robert A. Grant, United States District Judge for the Northern District of Indiana, sitting by designation.

minutes from the college campus for a traffic infraction. Washington was given a warning and no citation was issued. The officer observed Washington to be a "negro male, five feet eleven to six feet tall, approximately 180 pounds, round face and high cheek bones and approximately a two-inch natural . . . [and] about 20 to 22 [years old]." At the time Washington wore gray sweatpants with a pair of gym shorts over them and a green windbreaker.

A short time later Officer Glankler received a police report over the radio of the attempted rape together with a description of the assailant. Realizing that the description fit that of Washington, the officer proceeded to the Identification Division and found a picture of Washington.

In the meantime the victim had been taken to a hospital for a physical examination; a tranquilizer was administered to stabilize her upset condition. Upon completion of the examination, Officer Rogers asked her if she could identify the assailant from among several photographs of young black males, one of whom was Washington. The victim having passed over Washington's photograph, Officer Rogers told her that Washington was a suspect and had been seen in the campus area approximately fifteen minutes after the incident. Washington's photograph also contained information concerning a prior rape conviction. Upon a second look, the victim stated that Washington was not her assailant though his high cheek bones were similar to those of the assailant.

On March 14, 1975, four days after the incident, police showed the victim 171 color prints. She did not identify any as her assailant. After viewing a subsequent 546 color slides, she identified a slide of Washington as her attacker. She identified Washington three months later in a six-man lineup. At trial on June 10, 1975, she made an in-court identification of Washington.

## II. *Due Process Claim*

Washington contends that police suggestions at the attempted hospital identification made the later identifications of him inevitable, so that their admission at trial violated due process.

■■■■■ Although an initial identification procedure can be so suggestive as to taint all later identifications, the Supreme Court has instructed that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). *See United States v. Rich,* 580 F.2d 929, 935 (9th Cir. 1978); *United States v. Jones,* 512 F.2d 347, 351 (9th Cir. 1975); *United States v. Lincoln,* 494 F.2d 833, 840 (9th Cir. 1974). The same standard should be applied in evaluating the reliability of an out-of-court identification alleged to have been improperly tainted by earlier suggestive identification procedures. *Manson v. Brathwaite,* 432 U.S. 98, 106–07 n.9, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *Cf. Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Based on the *Simmons* standard, we reject Washington's claim.

### A. The Later Identifications Were Themselves Reliable

In *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), the Supreme Court wrote:

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*See Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Stoval v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Based on these criteria, the victim's later identifications of the slide, at the lineup, and in the courtroom were highly reliable.

1. *Opportunity to view.* The victim had an excellent opportunity to view her attacker. The dormitory shower was well-lit at the time of the assault. The victim was able to view the perpetrator for five to ten minutes from close range. Indeed, she had a better opportunity to view her assailant than that held sufficient in *Manson*; there the witness viewed the defendant intermittently for two to three minutes in a sunset-lit hallway. 432 U.S. at 114, 97 S.Ct. at 2253.

2. *Attention.* The conduct of the assailant ensured that the victim's attention was directed at him. As a "victim of one of the most personally humiliating of all crimes," the attention focused on the assailant was surely more than that of a casual observer. *Biggers,* 409 U.S. at 200, 93 S.Ct. at 382.

3. *Description.* The victim provided a specific and detailed description of her attacker, including his race, height, build, hair style, complexion, age, facial characteristics, and clothing. The description fit Washington in almost every respect. It was so accurate that upon hearing it over the radio, Officer Glankler immediately realized that Washington was the person described.

4. *Certainty.* The victim was relatively certain as to her identifications. Having not identified anyone at the hospital notwithstanding police encouragement, the victim later identified Washington from among 546 slides. She also identified him on two other occasions and never identified anyone else as her attacker.[1]

5. *Time elapsed.* The first identification of Washington took place only four days after the episode. The courtroom identification came within three months of the crime. Neither period of time is long enough to make the victim's identification unreliable as a matter of law. *See Biggers,* 409 U.S. at 201, 93 S.Ct. at 383.

In short, weighing the criteria specified by the Supreme Court, the circumstances surrounding the later identifications indicate their reliability.

B. The Hospital Procedure Had Little Impact upon the Later Identifications

Police suggestions at the hospital[2] did not significantly affect the later identifications. Notwithstanding the direct and immediate pressures to which the victim was subjected at the hospital, she steadfastly refused to identify anyone at that time. The later positive identifications took place when the suggestiveness was even more remote.

Moreover, while at the hospital the victim was emotionally upset, nervous, and under the influence of tranquilizers given her by the hospital. She had just been subjected to a degrading physical examination. She was anxious to leave the hospital. She was thus not in a frame of mind conducive to concentrating on an identification.

In short, the circumstances surrounding the later identifications attest to their reliability. And the police officer's earlier pressure did not serve to distort the victim's judgment or memory at the later identifications. Because there was no substantial likelihood of irreparable misidentification, the district court properly refused habeas relief.

AFFIRMED.

---

1. Though on recross-examination the victim acknowledged that she could not tell if and to what degree the police suggestions influenced her later identifications, after considering the entire record we conclude in section B *infra* that such suggestions did not significantly affect those later identifications so as to make their admission violative of due process.

2. We assume arguendo that police suggestions at the hospital would have rendered any identification made at that time so unreliable that its introduction at trial would have violated due process.