# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4330

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Northern |
| | * | District of Iowa. |
| Ronald Donelson, also known | * | |
| as Essie Donelson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 17, 2006
Filed: June 13, 2006

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Ronald "Essie" Donelson was convicted by a jury for being a felon in possession of a firearm after firing ten rounds from a stolen semiautomatic firearm at a group of four individuals. He was sentenced by the district court[1] to 120 months in prison, the statutory maximum. Donelson appeals both his conviction and sentence, arguing that his pretrial identification by one of the shooting victims should have been suppressed, that his conviction was not supported by sufficient evidence, and that the

_____

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

district court erred in departing upward when calculating his advisory guideline sentence. We affirm.

In the early morning of August 14, 2004 Donelson and his girlfriend Deborah Page were at the World Theater, an after hours club in Cedar Rapids, Iowa. Page got into a verbal dispute with Jenelle Givens which eventually led to a fight involving a number of individuals, including Donelson and Christopher Gantt, who was with Givens. The police were summoned at 3:22 a.m., and they broke up the fight. Donelson then left the World Theater, as did Givens, Gantt, and their friends.

Givens, her sister Sherron Smith, Gantt, and Erica Hugley walked the short distance from the World Theater to Givens' home on Second Avenue where they sat outside and continued drinking. Around 3:37 a.m. the group heard a series of popping noises behind them and turned to see a black male running towards them shooting a gun. In a statement to police Givens said that she had fled and hid under a truck for safety. As she was running, she was shot in the foot. No one else was hurt.

After the shooting started, Gantt also fled and encountered Officer Tracy Schmidt of the Cedar Rapids police force. Gantt informed Schmidt that someone had just fired shots at him and his friends and then pointed to a man running across Second Avenue and said "There he is!" Schmidt described the man as a black male wearing a red shirt and radioed an alert that a shooting suspect was running south across Second Avenue. Roughly five minutes later two other officers apprehended Donelson in an alley between Fourth and Fifth Avenues. He was sweaty, out of breath, and wearing a red shirt, dark blue shorts, and white tennis shoes. He admitted that he had been in an altercation at the World Theater and said that he was running for his life because someone was trying to kill him. Donelson was arrested and taken to the police station.

After the shooting Givens was taken by police to the hospital. Once there she told them that the person who had shot her was a black male with a goatee and braided hair, a description fitting Donelson. She also said she knew the man as Wick, which was Donelson's street name and the name he gave the police. The officers subsequently displayed a six man photo lineup to Givens which included Donelson's picture. She immediately identified him despite the fact that his picture was an old photo which showed his hair in a different style. She said she was sure that he had been the shooter. Although Givens had been drinking that night and had been given morphine at the hospital for her pain, the officers described her as coherent and oriented when they talked to her. Three days later Givens gave the police a signed, written statement repeating her identification of Wick as the shooter.

After Donelson was arrested, police took Sherron Smith, one of the other victims, to the station to see whether she would identify Donelson as the shooter. Although Smith was not able to make a definitive identification of Donelson because she had not seen the shooter's face, she did say that she thought the police had apprehended the right person. Smith also told the police that Donelson's attire matched that of the shooter except that she did not think the shooter had been wearing white tennis shoes.

Officers subsequently searched the area near where Donelson was arrested and found a .22 caliber firearm and 2 clips. One of the clips was loaded with ten .22 caliber bullets, and the other was empty. At the crime scene they also discovered ten .22 caliber shell casings. A firearms expert testified at trial that the casings were fired from the recovered gun and that both the gun and the ammunition had traveled in interstate commerce. At Donelson's sentencing hearing the government offered into evidence a police report indicating that the gun had been stolen. Donelson has several prior felony convictions: aggravated robbery, assault, and possession of a firearm committed as a juvenile at age 16, and narcotics possession and obstruction of justice committed as an adult. At trial he stipulated to being a convicted felon.

Donelson was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). His motion to suppress Givens' pretrial identification was denied, but Givens was not able to repeat her identification of Donelson at either the motion hearing or at trial. She also changed her account, testifying at trial that the shooter had been wearing a white shirt rather than a red one, that she could not remember whether he had facial hair, and that she had never met anyone named Wick before the shooting. When asked about her previous identification, she stated that she might have picked Donelson out of the lineup because he had been in a fight with her friends. Donelson was convicted by the jury and subsequently moved for acquittal, but his motion was denied.

Donelson was sentenced on November 30, 2005. At the sentencing hearing the district court applied a base offense level of 20, added 2 levels for a stolen weapon and 4 for use of a weapon in connection with another crime, and reached a total offense level of 26. That combined with Donelson's criminal history category of III resulted in an advisory guideline range of 78 to 97 months. The court then departed upward 2 levels under U.S.S.G. § 5K2.6 because the offense involved a reasonably foreseeable and substantial risk of death or bodily injury to multiple victims. See also U.S.S.G. § 2K2.1 cmt. n. 13(4). As an alternate basis for the departure the court found that Donelson's criminal history category understated the seriousness of his prior record since his three juvenile offenses had not been counted. See U.S.S.G. § 4A1.3(d)(2). With the departure, the resulting advisory guideline range was 97 to 121 months. After considering the factors in 18 U.S.C. § 3553(a), the court sentenced Donelson to 120 months which was the statutory maximum for his offense. See 18 U.S.C. 924(a)(2).

Donelson appeals his conviction and sentence. He contends on appeal that the pretrial identification of him by Givens should have been suppressed, that there was insufficient evidence to convict him, and that the district court abused its discretion

by departing upward from his advisory guideline range.[2] Donelson first argues that Givens' pretrial identification should have been suppressed because the photographic lineup was presented to her at the hospital after she had been drinking and treated with morphine. The government responds that the identification was admissible because the lineup was not suggestive and there is no other indication that it resulted in an irreparable misidentification.

A pretrial identification may implicate a defendant's due process rights, and its admissibility is reviewed de novo using a two part test. United States v. Hines, 387 F.3d 690, 693-94 (8th Cir. 2003). First, we determine whether the defendant has shown that the identification procedures were "impermissibly suggestive." United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). If that showing is made, we examine the totality of the circumstances to determine whether "the suggestive procedures created a very substantial likelihood of irreparable misidentification." Id.

The photographic lineup presented to Givens contained pictures of six individuals with similar physical characteristics and no other identifying information. See Manson v. Brathwaite, 432 U.S. 98, 117 (1977)(other individuals in photo spread should ideally resemble the suspect). She immediately picked out the photo of Donelson, despite the fact that it portrayed him with a different hairstyle and clothes than on the night of the shooting. Even before viewing the lineup, she had accurately described his appearance and given his street name. Donelson focuses on the possible effect of morphine and alcohol on her perceptions, relying on dicta in Washington v. Cupp, 586 F.2d 134, 137 (9th Cir. 1978). That citation has little bearing here where

---

[2]Donelson also argues that his trial counsel was ineffective for not investigating a possible exculpatory witness and for not calling the emergency room doctor who treated Givens the night she was shot. This claim is not ripe for review on Donelson's direct appeal. See United States v. Ramirez-Hernandez, No. 05-3386, slip op. at 4 (8th Cir. June 5, 2006).

-5-

Givens appeared coherent and alert at the hospital, said she knew Donelson, and was able to give his name, describe his appearance, and identify him with certainty shortly after the shooting. Moreover, Givens reinforced her identification three days later in writing. Donelson's motion to suppress was properly denied.

Donelson next argues that his conviction should be overturned. The government counters that the jury's verdict was supported by sufficient direct and circumstantial evidence. We review the evidence underlying a conviction de novo to determine if it is supported by substantial evidence. United States v. Boone, 437 F.3d 829, 838 (8th Cir. 2006). A conviction should not be overturned unless "the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt." United States v. Pardue, 983 F.2d 843, 847 (8th Cir. 1997) (internal quotations omitted). We will not second guess the jury's verdict if it is supported by any reasonable interpretation of the record. See United States v. Cunningham, 83 F.3d 218, 222 (8th Cir. 1996); see also United States v. Baker, 98 F.3d 330, 338 (8th Cir. 1996) (conviction must be upheld where evidence supports two conflicting hypotheses).

To be convicted of being a felon in possession of a firearm a defendant must have previously been convicted of a crime punishable by imprisonment for more than one year and must have knowingly possessed a firearm which had been in or affected interstate commerce. United States v. Brown, 422 F.3d 689, 691-92 (8th Cir. 2005). Donelson challenges the jury's finding that he knowingly possessed the firearm the police recovered by again attacking the credibility of Givens' identification of him on the night of the shooting. Once a pretrial identification has been admitted, however, it is for the jury to weigh it against countervailing evidence. See United States v. Reliford, 210 F.3d 285, 301 (5th Cir. 2000). We will not second guess the jury's decision to give Givens' pretrial identification more weight than her trial testimony. See Brown, 422 F.3d at 692 (the jury is the "ultimate arbiter" of witness credibility) (internal quotations omitted). The verdict was also supported by a good deal of other

evidence, including limited identifications by Gantt and Smith, the fact that Donelson was found sweating and out of breath near the scene of the crime approximately five minutes after it happened, and the altercation at the World Theater which may have supplied his motive. Investigators also located a discarded firearm near where Donelson was apprehended, and there was expert testimony at trial matching it to the ten empty shell casings found at the scene of the crime. Taking the evidence in a light most favorable to the government as we must, we conclude that his conviction was supported by sufficient evidence.

Donelson finally challenges the district court's decision to depart upward from the advisory guideline sentencing range. Although the guidelines are now advisory, they remain the "critical starting point" in imposing a sentence, United States v. Mashek, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005), and their incorrect application can require remand regardless of whether the resulting sentence was otherwise reasonable. Id. at 1015. A decision to depart upward on the basis of a permissible factor is reviewed for abuse of discretion. United States v. Myers, 439 F.3d 415, 417 (8th Cir. 2006). Donelson argues that the primary factor cited by the district court to support its decision to depart upward, his endangerment of multiple victims under U.S.S.G. § 5K2.6, was impermissible double counting because he had already received a 4 level enhancement under U.S.S.G. § 2K2.1(b)(5) for use of a firearm in connection with another felony offense. The government responds that there was no double counting because the harm on which the 4 level enhancement was based was distinct from the harm the district court relied on to justify the upward departure.

Double counting occurs if "one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part." United States v. Hipenbecker, 115 F.3d 581, 583 (8th Cir. 1997) (internal quotations omitted). The harm at which the 4 level enhancement was directed was the use of a firearm in connection with another felony (the Iowa offense of intimidation with a dangerous weapon). See Iowa Code Ann. §

708.6. The harm underlying the upward departure was the substantial risk to multiple victims of death or bodily injury. U.S.S.G. § 2K2.1 cmt. n. 13(4). These kinds of harm are not identical, and neither the enhancement nor the departure fully accounted for the harm addressed by the other. We conclude that there was no double counting.

The alternative basis for departure cited by the district court was that Donelson's criminal history score did not adequately account for the seriousness of his offense or the likelihood of recidivism, an encouraged basis under U.S.S.G. § 4A1.3(a)(1). Donelson argues that the district court erred in relying on his juvenile delinquencies, but the government responds that the court's reliance was reasonable given the seriousness of the unscored offenses. According to the uncontested presentence report, in his three juvenile offenses Donelson carried a loaded revolver; struck a woman in the face with his fist and a stick; and robbed a victim at gunpoint (and later threatened to kill that same victim with a shotgun for calling the police). Donelson was paroled for the robbery offense on May 11, 1999, and it could have added to his criminal history score if the present crime had been committed before May 11, 2004. See U.S.S.G. § 4A1.2(d)(2)(A). In light of the severity of Donelson's juvenile offenses and his subsequent recidivism, we conclude that the district court's alternate basis for departure was also reasonable. See United States v. Underwood, 364 F.3d 956, 969 (8th Cir. 2004). There was no abuse of discretion with respect to the upward departure and resulting sentence.

For these reasons the judgment of the district court is affirmed.

_____