# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3122
_____

United States of America

*Plaintiff - Appellee*

v.

Ceeron Tearrence Williams

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: April 14, 2022
Filed: July 26, 2022
_____

Before LOKEN, KELLY, and KOBES, Circuit Judges.
_____

LOKEN, Circuit Judge.

A jury convicted Ceeron Tearrence Williams of being a felon in possession of ammunition -- nine cartridge cases found at the scene of a shooting in front of a Kum & Go convenience store in Des Moines, Iowa shortly after 4:00 a.m. on January 21,

2018. See 18 U.S.C. §§ 921(a)(17)(A), 922(g)(1). The district court[1] sentenced Williams to 120 months imprisonment, the statutory maximum sentence, to be served consecutively to any undischarged term of state court sentences Williams was serving for offenses arising out of the same incident. See 18 U.S.C. § 924(a)(2); USSG § 5G1.1(a). He appeals the conviction and sentence, arguing the district court (i) abused its discretion in admitting lay opinion testimony by Detective Danny White of the Des Moines Police Department about what White saw on convenience store surveillance videos; (ii) erred at sentencing in cross-referencing to the guidelines base offense level for attempted second degree murder, USSG § 2A2.1; and (iii) abused its discretion in imposing a consecutive sentence. We affirm.

## I. Background

We summarize the relevant facts in the light most favorable to the jury's verdict. Earlier in the evening of the night in question, Williams and Raylon Canada were out on the town. They met with Machelle King, whom Canada was dating, and Shannon Galbreath. A cell-phone video shows Williams wearing a black coat with a fur hood and a pink cap, together with King and Galbreath. At some point, Tyler Armel texted King, hoping to meet up with her. Canada, pretending to be King, responded, telling Armel to meet at the Kum & Go gas station.

At approximately 4:05 a.m., Williams and Canada arrived at the Kum & Go in a black Tahoe driven by Canada, parking in front of the store. Minutes later, two more vehicles arrived. The first, a silver Malibu carrying King and Galbreath, also parked in front of the store. The second, a gold or tan Cadillac carrying Armel and Samir Eminic, parked at a gas pump. Armel and Eminic walked toward the door of the store. Canada exited the Tahoe and spoke with Armel near the front door.

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

Williams, wearing a black coat with a fur hood and a pink cap, exited the Tahoe and paused near the hood, watching Canada and Armel. Canada threw a punch at Armel, missed, and stumbled out of the way. With King, Galbreath, and Eminic watching, Williams approached Canada and Armel, drew a semi-automatic pistol, and fired nine rounds at Armel, striking him seven times. Law enforcement found nine cartridge casings in front of the store.

After the shooting, Williams got in the Tahoe with his firearm, and Canada drove away. King and Galbreath drove away in the Malibu. Eminic helped the grievously wounded Armel into their car and drove him to the hospital. After emergency surgery, Armel survived. At trial, all five eyewitnesses identified Williams as the shooter -- Armel, Canada, King, Galbreath, and Eminic.

During the ensuing investigation, Kum & Go provided law enforcement with footage from security cameras operating during the thirty minute period that included the shooting. Prior to the start of trial, the parties stipulated to admission of many exhibits, including five CDs, each about nine minutes long, showing multiple views of the front of the store from different angles, taken by Kum & Go security cameras located inside the store and outside the store covering the fuel pumps, and still-shot photos from the security videos. The indoor camera videos included sound recording.

Detective White, the lead detective, was the government's first witness. White first explained that "multi-view" security videos on the CDs would show the jury the scene as recorded by images from fuel pump and inside store cameras placed side-by-side. The first nine-minute CD, Exhibit 100, was played for the jury in portions, with Detective White describing what transpired beginning at 4:06 a.m., when the three vehicles began arriving. Defense counsel Steinbach objected this was hearsay. The court overruled the objection:

THE COURT: . . . The hearsay objection is overruled. The witness can testify as to the videos obtained from the Kum & Go.

You can make an objection if you believe there is improper testimony, Mr. Steinbach . . . .

Detective White's testimony continued until all of Exhibit 100 had been played, with two defense "Speculation" objections overruled and one hearsay objection sustained. The court then excused the jury for an afternoon recess during which attorney Steinbach, at the court's urging, argued this issue in greater detail:

MR. STEINBACH: [For Detective White] to testify what he thinks he sees in that video is . . . hearsay . . . and/or he's invading the province of the jury as to what they see on that video.

\* \* \* \* \*

THE COURT: So the hearsay objection is overruled because there's nothing that is being said. There's no out-of-court statement that he is repeating for the truth of the matter asserted.

How do you [government counsel] respond to the new objection, which is that the testimony of this witness invades the province of the jury . . . to find facts from evidence that you're presenting?

MR. KERNDT: Your Honor, this would be, like, if I showed him a picture and I asked what color is the sky in this picture. . . .

THE COURT: So the Court understands the objection. The jury will have this [video] evidence . . . in the record, and they will have the opportunity to view it while they're deliberating.

To th[e] extent that this witness is assisting the jury, based on his investigation and understanding, what this video is and what it shows, the objection is overruled . . . because it is helpful to the jury in light of the exhibit that is provided . . . .

-4-

To the extent that his testimony goes beyond . . . the findings based on his investigation, I would ask you to pose another objection, Mr. Steinbach.

But the Court finds that the witness's testimony . . . assisting the jury in understanding the exhibit that he has obtained from Kum & Go based upon his investigation is permissible.

The jury returned and Detective White's testimony about the CD videos and photographs continued, leading up to the evidentiary issue raised on appeal. The questioning turned to ten individual still-shot photos from the multi-view Exhibit 100 video. White had previously testified he heard nine gunshots in his many reviews of the video. When the Exhibit 100-I photo was displayed, White was asked:

MR. KERNDT: Q. Detective White, what moment is this with respect to when you first hear gunshots?

A. This is just a split second before you hear the gunshots. . . .

Q. Detective White, how long have you been a law enforcement officer?

A. For a little over 20 years.

Q. And as part of your duties . . . are you familiar with firearms?

A. Yes, sir.

Q. Do you see an individual with a pink cap on the left-hand side of the screen?

A. Yes, sir, I do.

Q. Tell the jury . . . in your investigation and experience, what do you see coming out of the end of his arm?

MR. STEINBACH: Objection, Your Honor. Invades the province of the jury, and this witness is not qualified to testify to what he believes he sees.

THE COURT: Thank you, Mr. Steinbach. So the objection is invades the province and qualification.
Do you wish to provide additional foundation as to the basis for his testimony?

MR. KERNDT: Happy to, Your Honor.

THE COURT: Thank you.

MR. KERNDT: Q. When you viewed the video . . . what did you hear?

A. I heard nine gunshots.

Q. And what's depicted here in [photo] 100-J, was that at the same time that you heard one of those gunshots?

A. Yes, sir.

Q. In your experience, when a firearm is fired, does it make any indications other than sound?

A. Yes, sir.

Q. What is that?

A. It's what's called muzzle flash. That's the explosion of the round or the bullet that's in the chamber. As the bullet explodes and sends the projectile out the barrel, there is a small amount of fire or burning powder that follows that bullet out of the end of the gun.

Q. Is that what you're referring to on 100-J?

A. Yes, sir.

The defense made no objection to the muzzle-flash foundational testimony and did not renew or request a ruling on its pending objection.

## II. The Evidentiary Issue

On appeal, Williams argues the district court violated Rule 701 of the Federal Rules of Evidence by permitting Detective White to testify as to the presence of "muzzle flash" in the surveillance video. Rule 701 provides:

> **Rule 701. Opinion Testimony by Lay Witnesses**
> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>     (a) rationally based on the witness's perception;
>     (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>     (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"Personal knowledge or perceptions based on experience is sufficient foundation for lay testimony." United States v. Smith, 591 F.3d 974, 982 (8th Cir. 2010) (quotation omitted). Rule 701 permits a law enforcement officer "to express an opinion that was rationally based on his or her perception, and helpful to understanding the witness's testimony *or to determining a fact in issue*." United States v. Lemons, 792 F.3d 941, 948 (8th Cir. 2015) (emphasis added). These issues obviously turn on the facts and circumstances of a particular case. "We review the district court's evidentiary rulings for clear abuse of discretion." United States v. Pirani, 406 F.3d 543, 555 (8th Cir. 2005) (en banc).

Here, the Rule 701 issue comes to us in a peculiar posture. When Detective White began describing what the jury was seeing in Exhibit 100, the multi-view security camera video, defense counsel objected that "he's invading the province of

the jury as to what they see on that video." The district court carefully considered this objection and explicitly found that the jury "will have the opportunity to view [the video] while they're deliberating," and that White's testimony "assisting the jury in understanding the exhibit that he has obtained from Kum & Go based upon his investigation is permissible." *Williams does not appeal that ruling*, and it was consistent with the plain language of Rule 701 as construed in our prior cases. Rather, he appeals only the muzzle flash testimony that was later offered when the district court asked the government to provide further foundation before the court ruled on Williams's objection to White testifying that, in one photo from the in-store video, Williams is holding a gun with his arm extended at the time White heard one of the gun shots in the sound recordings.

Williams did not object to this muzzle flash testimony, on either foundation or invade-the-province grounds. He did not renew his objection to the prior gun shot testimony, and did not press the court for a ruling on that pending objection. In other words, Williams is appealing a ruling *the court never made*. He is implicitly arguing that the district court was obligated *sua sponte* to interrupt and strike testimony to which there was no objection. That argument is plainly without merit. As we said in United States v. Mihm, 13 F.3d 1200, 1204 (8th Cir. 1994) (cleaned up):

> [T]he district court cannot be guilty of plain error because it specifically advised [Williams] . . . to raise this issue by [specific] objection at trial. Knowing that [Williams] was aware of the relevant issue and when to raise it, the district court properly left to [Williams] the decision whether to object to this [muzzle flash testimony].

Moreover, even if Williams preserved the issue, the admission of the muzzle flash testimony was neither an abuse of discretion nor plain error. To convict Williams of being a felon in possession of a firearm, the government had to prove (i) that Williams was the man in the black coat and pink hat who fired shots at Armel in front of the Kum & Go store and departed with a firearm that was never found, and

(ii) that the shell casings found at the scene were fired from the shooter's firearm and therefore were ammunition that had been knowingly in Williams's possession. See United States v. Obi, 25 F.4th 574, 578 (8th Cir. 2022). In closing argument, defense counsel emphasized that the jury should focus on whether Williams knowingly possessed ammunition, not whether he shot someone. It was dark at 4:00 a.m. so if the jury saw a light flash when it examined the video evidence during deliberations, Detective White's muzzle flash testimony based upon his experience as a law enforcement officer did more than merely narrate the video. As the district court found, it "assist[ed] the jury in understanding the exhibit." Rule 701 permits introduction of lay opinion testimony in just such circumstances. Nor did this brief testimony "so invade[] the province of the jury that we cannot with confidence say that there [is] no significant possibility that it had substantial impact on the jury." United States v. Peoples, 250 F.3d 630, 642 (8th Cir. 2001).

### III. The Base Offense Level Issue

Section 2K2.1 of the advisory guidelines governs the base offense level for Williams's firearm offense. Section 2K2.1(c)(1)(A) provides that if the "defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense . . . apply § 2X1.1 . . . if the resulting offense level is greater than that determined above." In this case, the § 2X1.1 cross-reference at issue is to § 2A2.1, the guideline for "Assault with Intent to Commit Murder; Attempted Murder." Under § 2A2.1(a)(1)-(2), the base offense level is 33 if the other offense would have constituted first-degree murder and 27 otherwise. The federal murder statute, 18 U.S.C. § 1111(a), determines what constitutes first-degree murder. USSG § 2A2.1 comment. (n.1). Murder "is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). A murder lacking aggravating factors enumerated in the statute "is murder in the second degree." Id.

At sentencing, after hearing extensive arguments, the district court applied the cross-referenced guideline for attempted second-degree murder:

> [C]learly this action demonstrated malice aforethought sufficient to be murder. As the Eighth Circuit instructions indicate, malice aforethought means an intent at the time of a killing willfully to take the life of a human being or an intent willfully to act in callous and wanton disregard of the consequences to human life, but malice aforethought does not necessarily imply any ill will, spite, or hatred towards the individual killed.

> \* \* \* \* \*

> The defendant shot bullets at close range to an individual. That is callous and wanton disregard of the consequences to human life.

> \* \* \* \* \*

> So the question of whether or not this is an attempted murder is easy to the Court. It's proven beyond a reasonable doubt.

Williams argues the court erred because the evidence does not support a finding of the intent necessary for attempted murder, malice aforethought. Therefore, he argues, the base offense level in § 2A.2.2 for Aggravated Assault is more appropriate.

Williams's intent is a finding of fact we review for clear error. United States v. Grauer, 701 F.3d 318, 325 (8th Cir. 2012). Here, there was no clear error. Williams intervened in an altercation between Canada and Armel, firing a gun nine times at close range and striking Armel seven times. Like the conduct in United States v. Comly, this unprovoked attack with a deadly weapon "demonstrated an intent to kill or, at the very least, an act in callous and wanton disregard of the consequences to human life." 998 F.3d 340, 343 (8th Cir. 2021); see United States v. McMorris, 224 F. App'x 549, 551 (8th Cir. 2007).

-10-

## IV. The Consecutive Sentence Issue

Prior to this federal prosecution, Williams was convicted in state court of Intimidation with a Dangerous Weapon, Injure/Provoke Fear; and Willful Injury, Causing Serious Injury. See Iowa Code §§ 708.6.1, 708.4. The state court sentenced Williams to two consecutive 10-year sentences for this offense conduct, which arose out of this same incident. At sentencing, rejecting Williams's argument for a concurrent sentence, the district court imposed a 120-month statutory maximum federal sentence to be served consecutively to the undischarged term of his state sentences. Williams appeals that ruling. We review a court's decision to impose a consecutive or concurrent sentence for reasonableness, United States v. Benson, 888 F.3d 1017, 1019 (8th Cir. 2018), which is akin to abuse-of-discretion review, United States v. Peterson, 869 F.3d 620, 621 (8th Cir. 2017).

District courts have broad discretion to impose consecutive or concurrent sentences, subject to the provisions of the Sentencing Guidelines. See 18 U.S.C. §§ 3553(a), (b), and 3584. Section 5G1.3 of the advisory guidelines addresses this issue when a defendant is subject to an undischarged term of imprisonment. If the undischarged term "resulted from another offense that is relevant conduct to the instant offense of conviction," as in this case, the sentence for the instant offense shall be adjusted for time served that will not be credited by the Bureau of Prisons, and "shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." USSG § 5G1.3(b)(1)-(2).

Though § 5G1.3(b) repeatedly uses the word "shall," the Sentencing Guidelines have been advisory, not mandatory, for nearly twenty years. Thus, not surprisingly, it is well established that "section 5G1.3(b)(2) does not prohibit the district court from exercising its statutory authority to impose a consecutive sentence." Benson, 888 F.3d at 1019. Section 5G1.3(b) "is merely advisory." Id. (quotation omitted). Conceding as much, Williams argues the district court abused its discretion because,

-11-

when prior state offenses stemmed entirely from the same incident, a federal court "should impose the sentence for this offense to run concurrently to the remainder of the undischarged state sentence."

At sentencing, in addition to considering the § 3553(a) sentencing factors, as § 3584(b) requires, the district court gave this issue careful attention. The court noted that "[t]his is an incredibly serious offense," that Williams's Category IV criminal history reflects "a pattern of assaultive conduct," and that he had assaulted two inmates while in custody following this Kum & Go incident. If the court were not limited to the 120-month statutory maximum, the court stated, a sentence at the high end of the advisory guidelines range -- 121 to 151 months -- "would be appropriate." Thus, based upon the totality of the circumstances, and recognizing "that the guidelines generally advise for convictions arising from the same relevant conduct to be concurrent," the court concluded that a consecutive sentence "is warranted, recognizing my authority to sentence them concurrently under the applicable factors." After careful review of the record, we agree with the government that the district court did not abuse its "broad discretion to order a consecutive sentence to an undischarged sentence." Peterson, 869 F.3d at 621.

The judgment of the district court is affirmed.

_____