# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1168
_____

United States of America

*Plaintiff - Appellee*

v.

George Harper, Jr.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: September 27, 2024
Filed: January 3, 2025
_____

Before COLLOTON, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

George Harper, Jr. was indicted for being a felon in possession of ammunition after law enforcement investigated a shooting in Davenport, Iowa. After two unsuccessful suppression motions, he pled guilty. At sentencing, the district court[1] calculated Harper's United States Sentencing Guidelines (USSG) range by applying

_____

[1]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

the attempted murder cross-reference and sentenced Harper to 67 months' imprisonment. Harper appeals the application of the cross-reference and the denial of one of his suppression motions. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On September 3, 2022, officers from the Davenport Police Department responded to a shooting at a gas station. A bullet grazed a bystander who required medical attention. He was, however, able to converse and relay what happened. The bystander and other witnesses told police that there had been two volleys of shots fired in quick succession. Officers located seven shell casings at the property—four near gas pumps on the east side of the lot, and three others a bit further south—corroborating this account. Analysis of the shell casings revealed that they had markings consistent with being fired from the same firearm.

Police reviewed surveillance footage from the gas station, which showed an individual carrying a firearm with an extended magazine and firing the weapon several times. The video also showed the shooter talking with a third person—who officers were able to identify as J.H.—near the gas pump where officers found the first group of shell casings. On September 6, Detective Dan Reeves interviewed J.H., who said that he knew the shooter only as "G." According to J.H., he spoke with "G" at the gas station, and "G" displayed a firearm with an extended magazine. While they were speaking, "G" told J.H. to "get out of the way" and started firing at a car that had just arrived.

J.H. also told officers that "G" arrived at the gas station with J.H.'s son— A.H.—right before the shooting. Detective Reeves interviewed A.H. that same day. A.H. told the police that he knew "G"—though not very well—and gave him a ride to the gas station from a local bar, with a brief stop at a pharmacy along the way. When shown a still image from gas station surveillance footage, A.H. identified the shooter as "G."

The next day, on September 7, Detective Reeves again met with A.H. This time, Detective Reeves brought a photo array[2] to see if A.H. could identify the shooter. Harper's photograph was included in the array. With his thumb placed directly above Harper's picture, Detective Reeves displayed the array and asked A.H. if he could identify the shooter. After A.H. said he "didn't know ['G'] like that," Detective Reeves expressed his frustration. He told A.H. that he knew A.H. wasn't telling the truth. He insisted that A.H. could "sell somebody else that bullshit," but Detective Reeves "d[id] not buy it."

Detective Reeves continued to press A.H. to make an identification, stating he was "going to keep putting [his] foot on the gas," that A.H. wasn't "going to like it," and that Reeves would be "blowing him up." Reeves further told A.H., "If I can hit you with perjury charges, then I will." In reply, A.H. expressed concern for his and his family's safety if he were to cooperate, but Detective Reeves continued to doubt A.H.'s truthfulness, suggesting A.H. speak with his father because "he['s] been on these streets." A.H. agreed to do so, and the conversation ended.

Two days later, Detective Reeves again met with A.H. He again displayed to A.H. the same photographic lineup from their first interview, and he again placed his thumb directly above Harper's photograph. This time, however, A.H. expressed no uncertainty. He immediately pointed to Harper's photograph, indicating with 100% certainty that the photo was of the shooter, "G."

On September 19, Harper was arrested on state charges related to the shooting. In a post-<u>Miranda</u>[3] interview, Harper told police officers that he had possessed a

---

[2]A photo array is a collection of photographs for eyewitnesses to identify suspects. <u>See</u> <u>United States v. Johnson</u>, 56 F.3d 947, 954 (8th Cir. 1995). The arrays depict individuals with similar features and—as here—often consist of six photographs arranged in two rows of three. They are also known as "photo spreads," <u>see, e.g.</u>, <u>id.</u>, or "photographic lineup[s]," <u>see, e.g.</u>, <u>Schawitsch v. Burt</u>, 491 F.3d 798, 800 (8th Cir. 2007), so we use the terms interchangeably.

[3]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

nine-millimeter pistol with an extended magazine. According to Harper, a different person—X.B.—was the aggressor in the incident, pulling up to the gas station in a car and exiting with a firearm in hand. Though he told police that X.B. fired first, Harper admitted that he fired back at least two or three times.

Ultimately, Harper was indicted on one count of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Harper moved to suppress A.H.'s eyewitness identification on the grounds that it was impermissibly suggestive in violation of Harper's due process rights.[4] At the suppression hearing, Detective Reeves testified about the investigation, how he became aware of A.H., and his interactions with A.H. on both September 7 and September 9. On cross-examination, Detectives Reeves admitted that he broke Davenport Police Department policy and procedures during those interactions, as he conducted the photographic lineup procedure while he was involved in the investigation. Detective Reeves further admitted that his thumb was placed above Harper's photograph in the array both times, though he testified that he did not place his thumb there intentionally.

After the hearing, the district court denied Harper's motion to suppress. It concluded that A.H. knew Harper from before the incident, and that A.H.'s reluctance to identify Harper at the first interview was not because he didn't know who the shooter was, but rather because he was fearful of getting involved with a police investigation of an acquaintance. Further, the district court held that Detective Reeves's thumb placement was not impermissibly suggestive, instead reasoning it was just the way he was holding the paper. Accordingly, the district court held that Harper had not shown a likelihood of irreparable misidentification sufficient to warrant suppression. Harper subsequently pled guilty to the indictment but

---

[4]In a separate motion, Harper moved to suppress his statements to police and the fruits of a subsequent search, arguing that his statements and consent to search were involuntary due to intoxication. The district court denied that motion after an evidentiary hearing, and Harper does not challenge that denial on appeal.

preserved his right to appeal the denial of his motion to suppress A.H.'s identification and the district court's eventual sentence.

Before sentencing, the United States Probation Office prepared a Presentence Investigation Report (PSR), which calculated a base offense level of 27—to which Harper objected—because Harper possessed the ammunition at issue in connection with the attempted murder of X.B. At sentencing, Detective Reeves again testified. He stated that there was no evidence that anyone but Harper fired a gun during the incident. Detective Reeves also testified that he was able to confirm that two barrages of shooting occurred: four shots with X.B. standing close to Harper and three more once X.B. began fleeing from the scene. Detective Reeves did acknowledge, however, that J.H. told police that X.B. had a firearm; that other witnesses did not think Harper was firing at any particular person; and that surveillance footage was not clear enough to show conclusively whether Harper was firing at X.B.

The district court found that the cross-reference to attempted murder applied, crediting Detective Reeves's testimony that there was no evidence that X.B. fired at Harper and that Harper fired multiple rounds at X.B., even after X.B. began fleeing in his car. The district court overruled Harper's objection, calculated a Guidelines sentencing range of 63 to 78 months, and sentenced Harper to 67 months' imprisonment, to be followed by a 3-year term of supervised release. Harper now appeals, challenging the eyewitness identification procedures and the application of the attempted murder cross-reference.

II.

Harper first argues that the district court erred by denying his motion to suppress A.H.'s identification, asserting that Detective Reeves's conduct rendered the identification inherently unreliable. "We review the admissibility of identification evidence [under the Due Process Clause] de novo." United States v. Whitewater, 879 F.3d 289, 292 (8th Cir. 2018).

Due process prohibits the admission of evidence derived from improper eyewitness identification procedures. Neil v. Biggers, 409 U.S. 188, 196-97 (1972). We use a two-step analysis to determine whether an eyewitness identification falls in that category. United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003). "First, we determine if the identification procedures were 'impermissibly suggestive.'" Id. (citing Simmons v. United States, 390 U.S. 377, 384 (1968)). If they were, we consider the totality of the circumstances to determine if the procedures "created a very substantial likelihood of irreparable misidentification." United States v. Donelson, 450 F.3d 768, 773 (8th Cir. 2006) (citation omitted).

As already discussed, Detective Reeves pressed A.H. to identify "G." He used veiled threats of prosecution and incarceration, going so far as stating that he would "keep [his] foot on the gas" and "blow [A.H.] up." Further, each time he displayed the photo array to A.H., Detective Reeves had his thumb positioned directly above Harper's photograph in the array. In doing so, Detective Reeves broke Davenport Police Department protocol. After A.H. initially declined to identify "G," Detective Reeves followed up two days later. At that meeting, Detective Reeves displayed the same photo array, with his thumb again positioned directly above Harper's photograph. This time, A.H. promptly identified the shooter with 100% confidence.

Harper asserts that this procedure was impermissibly suggestive, warranting suppression. While this conduct might be so in the right circumstances, see, e.g., Perry v. New Hampshire, 565 U.S. 228, 243 (2012) (noting that procedure is improperly suggestive where "suspect is pointed out before or during a lineup" (quoting United States v. Wade, 388 U.S. 218, 233 (1967))); see also United States v. Woolery, 735 F.2d 818, 821 (5th Cir. 1984) (per curiam) (noting improper procedure where officers threatened eyewitness with incarceration); but see Briscoe v. Cnty. of St. Louis, 690 F.3d 1004, 1014 (8th Cir. 2012) (holding that violation of department policy insufficient to make procedure impermissibly suggestive), we need not resolve the issue in deciding this appeal. Because it is dispositive, we begin with consideration of whether there was a "very substantial likelihood of irreparable

misidentification." United States v. Smith, 21 F.4th 510, 518 (8th Cir. 2021) (citation omitted).

"[R]eliability is the linchpin" of our analysis. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). Thus, to determine the identification's admissibility under the Due Process Clause, we consider "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Williams, 340 F.3d at 567 (quoting Manson, 432 U.S. at 114). Those considerations are straightforward here. A.H. knew Harper, drove him to the gas station, and observed the shooting. A.H. identified Harper as the shooter from surveillance footage, even before being presented with the photo array. In contrast to eyewitnesses asked to identify unknown suspects, A.H. merely reidentified Harper—a known party—as the shooter. See Burton v. St. Louis Bd. of Police Comm'rs, 731 F.3d 784, 797 (8th Cir. 2013) (rejecting due process challenge where eyewitness knew suspect before identification).

Harper acknowledges that the Manson factors do not support his argument. Instead, he asserts that Detective Reeves's conduct transforms A.H.'s identification into one that is "manifestly unreliable." But the law is clear: The reliability of an eyewitness identification—and hence its admissibility under due process principles—rests not merely on the actions of law enforcement, but on the probable effect of those actions on the identification itself. See Manson, 432 U.S. at 112-13 (rejecting per se suppression of suggestive eyewitness identifications). Under the circumstances presented here, there is not a "very substantial likelihood" that A.H. mistakenly identified Harper. See Smith, 21 F.4th at 518. The use of that identification does not offend Due Process, and the district court did not err in denying Harper's motion to suppress on that basis.

## III.

Harper next argues that the district court erred by cross-referencing USSG § 2A2.1(a)(2), the attempted murder provision, when it calculated his base offense level because "the government failed to prove that [he] acted with malice aforethought, as required [to prove] attempted murder." "We review the district court's factual findings for clear error and its application of the Guidelines de novo." United States v. Clark, 999 F.3d 1095, 1097 (8th Cir. 2021) (per curiam). "[The defendant]'s intent is a finding of fact we review for clear error." United States v. Williams, 41 F.4th 979, 985-86 (8th Cir. 2022).

USSG § 2K2.1 determines the base offense level for a defendant—like Harper—who unlawfully possesses ammunition. But "[i]f the court finds that the defendant used the [ammunition] 'cited in the offense of conviction in connection with the . . . attempted commission of another offense,' however, §§ 2K2.1(c)(1)(A) and 2X1.1(c)(1) direct the court to cross-reference to the Guidelines section that expressly covers the other offense." Clark, 999 F.3d at 1097 (ellipsis in original) (citation omitted); see also id. (noting that the court must find facts by a preponderance of the evidence). Section 2A2.1(a)(2) incorporates the federal murder statute, which prohibits "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). "[M]alice aforethought," we have said, is the "intent to kill or, at the very least, . . . act in callous and wanton disregard of the consequences to human life." United States v. Comly, 998 F.3d 340, 343 (8th Cir. 2021). The district court applied that cross-reference here after finding—by a preponderance of the evidence—that Harper acted with malice aforethought.

Harper asserts that this was error. He suggests that the district court "overlooked the lack of evidence that Mr. Harper aimed the firearm at anyone," that "there is no evidence that Mr. Harper fired at X.B. (as opposed to, for instance, firing warning shots)," and that eyewitnesses and law enforcement could not testify that "Harper fired at anyone in particular."

The record reflects otherwise. By his own admission, Harper fired multiple rounds at X.B. Normally, "shooting at a particular person . . . demonstrates a specific intent to kill." United States v. Greer, 57 F.4th 626, 629 (8th Cir. 2023). The Government's evidence confirms that occurred here. Four shell casings were recovered from where Harper was initially standing, and three more from Harper's secondary location. Security camera footage and eyewitness testimony demonstrate that Harper was the shooter; that he warned a bystander to move out of the way before firing; and that he fired four shots, moved to a second location, then fired three more. And despite Harper's initial statements to the police, there is no evidence that X.B. fired a weapon at any time during the incident.

These facts all support the district court's finding that Harper acted with "an intent to kill or, at the very least, . . . in callous and wanton disregard of the consequences to human life." See Comly, 998 F.3d at 343 (applying first degree murder cross-reference where defendant fired multiple rounds at close range). Accordingly, the district court did not clearly err in finding that Harper acted with malice aforethought. See Williams, 41 F.4th at 985-86 (applying cross-reference where defendant fired nine rounds at close range); Greer, 57 F.4th at 629 (finding no clear error where defendant fired four shots at close range); see also United States v. McMorris, 224 F. App'x 549, 551 (8th Cir. 2007) (unpublished per curiam) (finding no clear error where defendant fired three shots from 50 to 60 feet away).

IV.

For these reasons, we affirm the judgment of the district court.

_____